# IN THE SUPREME COURT OF CALIFORNIA

MARISOL LOPEZ,
Plaintiff and Appellant,

v.

GLENN LEDESMA et al.,
Defendants and Appellants;
BERNARD KOIRE,
Defendant and Respondent.

S262487

Second Appellate District, Division Two
B284452

Los Angeles County Superior Court
BC519180

February 24, 2022 (reposting corrected version)

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Meehan* concurred.

---

\* Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LOPEZ v. LEDESMA

S262487


Opinion of the Court by Liu, J.


Under a provision of the Medical Injury Compensation Reform Act (MICRA), damages for noneconomic losses shall not exceed $250,000 in "any action for injury against a health care provider based on professional negligence." (Civ. Code, § 3333.2, subds. (a), (b); all undesignated statutory references are to the Civil Code.) An action is based on "professional negligence" and thereby subject to section 3333.2's cap on noneconomic damages only if a health care provider's services are "within the scope of services for which the provider is licensed" and "are not within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2).)

We granted review to determine whether section 3333.2 applies to actions against physician assistants who are nominally supervised by a doctor but receive minimal or no actual supervision when performing medical services. Construing the statute in light of its purposes and our precedent, we hold that section 3333.2 applies to a physician assistant who has a legally enforceable agency relationship with a supervising physician and provides services within the scope of that agency relationship, even if the physician violates his or her obligation to provide adequate supervision.

We also granted review on a second issue: whether a delegation of services agreement (DSA) between a supervising physician and a physician assistant is legally effective where the

1

physician is disabled and unable to practice medicine. On closer examination, we decline to decide this issue, which was not considered by the trial court or by the Court of Appeal.

## I.

Because no party disputes the trial court's factual findings, we rely on the trial court's statement of decision to summarize the pertinent facts in this case. (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.)

Dr. Glenn Ledesma, a dermatologist, owned and operated a dermatology clinic in Southern California. Dr. Bernard Koire, a plastic surgeon, contracted with the clinic to provide physician services, physician assistant supervisor services, and consulting services. Suzanne Freesemann and Brian Hughes worked as physician assistants at the clinic. In 2009, Freesemann and Dr. Ledesma signed a DSA designating Dr. Ledesma as Freesemann's supervising physician. According to the trial court, "Neither party formally revoked the DSA and it was thus nominally . . . in effect" at the time of the events giving rise to this case. Hughes and Dr. Koire signed a DSA designating Dr. Koire as Hughes's supervising physician. Although the DSA between Hughes and Dr. Koire was undated, the trial court found that it established a supervising physician-physician assistant relationship.

O.S. was a patient at Dr. Ledesma's dermatology clinic who received treatment from Freesemann and Hughes on several occasions in 2010 and 2011. O.S. first visited the clinic on December 8, 2010, after her mother, Marisol Lopez, noticed a dark spot on O.S.'s scalp when she was seven or eight months of age. During this appointment, Freesemann obtained a medical history, examined O.S.'s scalp, and recommended an

"excision and biopsy" treatment plan. On January 3, 2011, Hughes performed a "shave biopsy" of O.S.'s lesion and sent the biopsied tissue to be reviewed by a physician. O.S. attended a followup appointment with Hughes on January 17, 2011, during which Hughes reviewed the biopsy report and found that the biopsied lesion was "benign" and that "everything [was] normal."

Lopez returned to Ledesma's clinic on June 11, 2011, after noticing that O.S.'s lesion was growing back. Freesemann assessed the lesion as "wart(s)" and recommended that it be burned off with liquid nitrogen. O.S. received the liquid nitrogen treatment at the clinic on July 27, 2011. She returned to the clinic on September 9, 2011, after the lesion grew back yet again. During this visit, Hughes assessed the lesion as "warts" and prepared a treatment plan referring O.S. to a general surgeon to remove the "large growth." Dr. Koire reviewed and countersigned the treatment plan 88 days later. In December 2011, a general surgeon removed the lesion and diagnosed it as "benign pigmented intradermal intermediate congenital nevus."

In early 2013, Lopez noticed a bump on O.S.'s neck. A doctor excised the neck mass and referred O.S. to an oncologist, who diagnosed O.S. with "metastatic malignant melanoma." O.S. died on February 27, 2014.

At the time of Freesemann's clinical encounters with O.S., Dr. Ledesma was no longer fulfilling any of his supervisory obligations under the 2009 DSA. According to the trial court, Dr. Ledesma was "involved in operating the clinic facilities in a business sense," but "he was no longer in active practice as a physician." During Hughes's clinical encounters with O.S., "Dr. Koire was not available in person or by electronic

communications at all times." Dr. Koire also "was no longer engaged in active practice."

In 2013, Lopez filed a medical malpractice action asserting negligence claims against Hughes, Freesemann, Dr. Ledesma, Dr. Koire, and others. After O.S. died, Lopez amended the complaint to assert a wrongful death claim. The trial court found in favor of Lopez on her negligence claims against Freesemann and Hughes, holding that they did not take adequate steps to diagnose O.S.'s condition and did not seek guidance from a physician. The court held that Dr. Ledesma was vicariously liable for the negligent actions of Freesemann and that Dr. Koire was vicariously liable for the negligent actions of Hughes. The court awarded Lopez $11,200 in economic damages. It also awarded Lopez $4.25 million in noneconomic damages but reduced this amount to $250,000 pursuant to MICRA's cap on noneconomic damages. (§ 3333.2, subd. (b).)

On appeal, Lopez argued that the trial court's reduction in damages was improper because Freesemann's and Hughes's conduct fell within the proviso that excludes from section 3333.2's coverage conduct that is outside "the scope of services for which the provider is licensed" or "within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2); see *Lopez v. Ledesma* (2020) 46 Cal.App.5th 980, 985 (*Lopez*).) The Court of Appeal rejected this argument and affirmed the trial court's reduction in damages. (*Lopez*, at pp. 985, 999.) It held that "a physician assistant acts within the scope of his or her license for purposes of section 3333.2, subdivision (c)(2) if he or she has a legally enforceable agency agreement with a supervising physician, regardless of the quality of actual supervision." (*Id.* at p. 985.) Justice

Ashmann-Gerst dissented on the ground that Freesemann and Hughes were not permitted to provide care to patients without receiving actual supervision and thus acted outside the scope of services for which they were licensed. (*Id.* at pp. 1005–1006 (dis. opn. of Ashmann-Gerst, J.).) We granted review.

## II.

The Legislature enacted MICRA in 1975 (Stats. 1975, 2d Ex. Sess., ch. 1, § 1, p. 3949; see *id.*, § 24.6, p. 3969) to address a statewide "crisis regarding the availability of medical malpractice insurance." (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 577.) "The problem . . . arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as 'skyrocketing' rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or treatment, to terminate their practice in this state altogether, or to 'go bare,' i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice." (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 371.)

In the Legislature's view, "[t]he continuing availability of adequate medical care depends directly on the availability of

adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation." (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111 (*Western Steamship*).) "Accordingly, MICRA includes a variety of provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence." (*Ibid.*)

Section 3333.2 is one such provision. It provides: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, . . . and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." It defines "professional negligence" as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2).)

In the same year it passed MICRA, the Legislature enacted the Physician Assistant's Practice Act (PAPA). This latter act established the position of "physician assistant" to address "the growing shortage and geographic maldistribution of health care services in California." (Bus. & Prof. Code, § 3500.) The act aims "to encourage the effective utilization of the skills of physicians . . . by enabling them to work with qualified physician assistants to provide quality care." (*Ibid.*, as amended by Stats. 2019, ch. 707, § 1.) It defines

a "physician assistant" as "a person who meets the requirements of this chapter and is licensed by the [Physician Assistant B]oard." (Bus. & Prof. Code, § 3501, subd. (d).) To practice as a physician assistant, an individual must complete an approved training program and pass a licensing examination. (*Id.*, § 3519, subds. (a), (b).) Once licensed, a physician assistant may perform medical services "under the supervision of a licensed physician." (*Id.*, § 3502, subd. (a)(1).) Several sections of the PAPA were amended effective January 1, 2020, pursuant to Senate Bill No. 697 (2019–2020 Reg. Sess.). (See Stats. 2019, ch. 707.) We apply the law as it existed at the time of the relevant events.

The issue in this case is whether section 3333.2's cap on noneconomic damages applies to actions against physician assistants where a licensed physician has legal responsibility for supervising the physician assistant but provides minimal or no actual supervision. We review this question of statutory interpretation de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801.)

We turn first to the language of the statute. As noted, section 3333.2 applies only to actions "based on professional negligence." (§ 3333.2, subd. (a).) The definition of "professional negligence" in section 3333.2 has four elements: (1) "a negligent act or omission to act by a health care provider in the rendering of professional services," (2) "which act or omission is the proximate cause of a personal injury or wrongful death," (3) "provided that such services are within the scope of services for which the provider is licensed," and (4) "which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2).) The parties do not dispute that the first two elements are satisfied. The question is

whether a physician assistant who receives negligible supervision from his or her supervising physician provides services outside "the scope of services for which the provider is licensed" or "within [a] restriction imposed by the licensing agency or licensed hospital." (*Ibid.*) We address these elements in turn.

## A.

The language "scope of services for which the provider is licensed" (§ 3333.2, subd. (c)(2)) is naturally understood as the general range of activities encompassed by the provider's license. A psychiatrist, for instance, is licensed to provide psychiatric treatment. Thus, a psychiatrist's conduct arising out of the course of psychiatric treatment falls within the scope of services for which the psychiatrist is licensed. (See *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436 (*Bourhis*) ["it is clear that the psychiatrist's conduct arose out of the course of the psychiatric treatment he was licensed to provide"].) By contrast, a "psychologist perform[ing] heart surgery" does not provide services within the scope of his or her license. (*Ibid.*)

The PAPA and the regulations promulgated by the Physician Assistant Board set forth the medical services that a licensed physician assistant "may perform." (Bus. & Prof. Code, former § 3502, subd. (a); see Cal. Code Regs., tit. 16, § 1399.540, subd. (a).) "A physician assistant may only provide those medical services which he or she is competent to perform and which are consistent with the physician assistant's education, training, and experience, and which are delegated in writing by a supervising physician who is responsible for the patients cared for by that physician assistant." (Cal. Code Regs., tit. 16, § 1399.540, subd. (a).) During the relevant time period,

the writing that delegated medical services to a physician assistant was called a DSA. (*Id.*, § 1399.540, subd. (b).) A physician assistant "may perform" the services delegated in the DSA when the services are rendered "under the supervision of a licensed physician and surgeon." (Bus. & Prof. Code, former § 3502, subd. (a).) In addition to these general rules, the PAPA specifies particular areas of practice, such as "[t]he practice of dentistry," that physician assistants may not perform even under the supervision of a licensed physician. (*Id.*, former § 3502, subd. (d).)

The question here is whether a physician assistant who establishes a legal relationship with a supervising physician through a DSA, but in practice receives minimal or no supervision, is nonetheless practicing within "the scope of services for which the provider is licensed." (§ 3333.2, subd. (c)(2).) Because a physician assistant is only authorized to perform services "when the services are rendered under the supervision of a licensed physician and surgeon," this boils down to a question of what it means for a physician assistant to be "under the supervision" of a licensed physician. (Bus. & Prof. Code, former § 3502, subd. (a).)

According to Lopez, that phrase means that the level of supervision provided by the assigned supervising physician must be *adequate* under the governing statutes and regulations. By contrast, Freesemann and Hughes contend that a physician assistant is "under the supervision" of a licensed physician so long as the physician has taken on the *legal responsibility* to supervise the physician assistant through the formation of a DSA, regardless of the adequacy of supervision at any given time. Both are reasonable interpretations of the statute's ambiguous text. But we do not read the text in a vacuum; our

task is to construe the statutory language in a manner that "comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)

The version of Business and Professions Code section 3501 that applies to this case defined "supervision" to mean that a licensed physician "oversees the activities of, and accepts responsibility for, the services rendered by the physician assistant." (Bus. & Prof. Code, former § 3501, subd. (a)(6) [now subd. (f)(1)].) This language suggests that a physician "supervis[es]" a physician assistant when the physician undertakes legal responsibility for the physician assistant's conduct. While that provision has recently been amended to additionally specify that supervision requires "[a]dherence to adequate supervision as agreed to in the practice agreement," the amended law is not before us today. (Bus. & Prof. Code, § 3501, subd. (f)(1)(A).)

Further, as noted, the Legislature enacted MICRA "in response to rapidly increasing premiums for medical malpractice insurance" that threatened the availability of adequate medical care in California. (*Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 214; see *Western Steamship*, *supra*, 8 Cal.4th at p. 111.) "MICRA provisions should be construed liberally in order to promote the legislative interest . . . to reduce [these] premiums." (*Preferred Risk*, at p. 215.) The act aims "to contain the costs of malpractice insurance by controlling or redistributing liability for damages, thereby maximizing the availability of medical services to meet the state's health care needs." (*Western Steamship*, at p. 112.)

"Section 3333.2 constitutes a key component of this program." (*Western Steamship*, at p. 114.) The $250,000 cap was designed "to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages." (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 641 (*Salgado*).) An interpretation of the "scope of services" proviso based on adequacy of supervision "would threaten not only this goal but also the broader purpose of MICRA" (*Western Steamship*, at p. 112) for several reasons.

First, a standard based on adequacy of supervision could create inconsistencies in damages depending on whether a plaintiff sues the supervising physician or the physician assistant. A supervising physician who provides inadequate supervision to a physician assistant may be directly liable for his or her own negligence. (See *Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 815 ["Liability for negligent supervision and/or retention of an employee is one of direct liability for negligence, not vicarious liability."].) Under such a theory of liability, any noneconomic damages would be subject to the cap in section 3333.2 because a supervising physician who negligently supervises a physician assistant who commits malpractice acts "within the scope of services for which the provider is licensed." (§ 3333.2, subd. (c)(2).) But, in Lopez's view, if the plaintiff pursued a negligence claim against the physician assistant, the limit on noneconomic damages would not apply because the inadequate supervision would render the physician assistant outside the scope of his or her license. "Permitting an unlimited award of noneconomic damages against the physician assistant and only a limited award against the supervising physician based upon the same harm would be both irrational and inconsistent with MICRA's goal of

11

predictability in damage awards." (*Lopez*, *supra*, 46 Cal.App.5th at p. 998.)

Second, the regulations governing physician assistants place most of the onus of ensuring compliance with day-to-day supervisory obligations on the supervising physician, not the physician assistant. Those regulations provide that a "supervising physician shall be available in person or by electronic communication at all times when the physician assistant is caring for patients," a "supervising physician shall observe or review evidence of the physician assistant's performance" of all delegated tasks and procedures, and a "supervising physician has continuing responsibility to . . . make sure that the physician assistant does not function autonomously." (Cal. Code Regs., tit. 16, § 1399.545, subds. (a), (c), (f).) As a practical matter, a physician assistant may have little ability to monitor or control whether a supervising physician complies with his or her supervisory obligations, such as the obligation to be available at all times.

The trial court in this case found it likely that Freesemann and Hughes knew they were not adequately supervised. To take into account a physician assistant's knowledge, one could craft a rule that deems a physician assistant's services to be outside the scope of his or her license when the physician assistant knows that the supervising physician violated a supervisory obligation and the physician assistant proceeds to treat patients nonetheless. It may be that such a rule would protect the health and welfare of some patients by disincentivizing physician assistants from acting autonomously in the face of known supervisory violations.

But such a rule, which no party urges us to adopt, would require case-by-case inquiry into the nature, timing, and extent of a physician assistant's knowledge of lapses in supervision. In circumstances where an injury is attributable to multiple lapses, would it be enough to take a physician assistant's activities outside the scope of his or her license if the physician assistant knows of some but not all of the lapses? And for what period of time in relation to the injury must the physician assistant know of the lapses? The latter question may be especially relevant in the context of a missed diagnosis or failure to provide appropriate treatment over several months or years. Detailed inquiry into and potential litigation over these fact-intensive questions would be at odds with MICRA's goal of ensuring predictability in damage awards. Moreover, it remains the case that such knowingly autonomous conduct by physician assistants constitutes professional negligence that may result in legal liability (albeit limited by MICRA) and professional discipline. Although these consequences do not go as far as Lopez would like, they do disincentivize rogue conduct in the known absence of meaningful supervision.

An interpretation of the "scope of services" proviso based on the legal agency relationship between the supervising physician and physician assistant avoids the unpredictability discussed above. Under this interpretation, a physician assistant acts within the scope of his or her license as long as he or she acts under an established agency relationship with a licensed physician, provides the type of medical services he or she is authorized to provide as the physician's agent, and does not engage in an area of practice prohibited by the PAPA.

A standard based on the formation of a legal agency relationship also comports with MICRA's goal "to control and

reduce medical malpractice insurance costs." (*Salgado*, *supra*, 19 Cal.4th at p. 641.) "In medical malpractice litigation, noneconomic damages typically account for a large part of a total damage award and, therefore, a large part of the insurance carriers' expense." (*Perry v. Shaw* (2001) 88 Cal.App.4th 658, 668 (*Perry*).) The size of noneconomic damage awards against a physician assistant affects the supervising physician's insurance premiums because after an agency relationship is formed, the supervising physician is legally responsible for any malpractice committed by the physician assistant. (See Cal. Code Regs., tit. 16, § 1399.545, subd. (f) ["The supervising physician shall be responsible for all medical services provided by a physician assistant under his or her supervision."].) The risk of unpredictable, large noneconomic damage awards against a physician assistant therefore may impact the malpractice insurance premiums of both the physician assistant and the supervising physician.

To be sure, there are reasonable policy arguments for excluding physician assistants who perform medical services without actual supervision from a cap on noneconomic damages, and the Legislature is well equipped to weigh and reweigh the competing policy considerations. But our role is confined to interpreting the statute before us in the manner that comports most closely with the Legislature's purpose in enacting MICRA. We hold that a physician assistant practices within the scope of his or her license for purposes of MICRA's cap on noneconomic damages when the physician assistant acts as the agent of a licensed physician, performs the type of services authorized by that agency relationship, and does not engage in an area of practice prohibited by the PAPA. (Bus. & Prof. Code, former § 3502, subd. (d).)

**B.**

Next, we turn to the proviso exempting from section 3333.2 services that are "within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2).) In *Bourhis*, we interpreted an identical provision in another section of MICRA. (*Bourhis*, *supra*, 40 Cal.3d at pp. 435–436; see Bus. & Prof. Code, § 6146, subd. (c)(3).) *Bourhis* involved a psychiatrist who allegedly induced the plaintiff "to participate in sexual conduct by suggesting that it was part of the therapy designed to alleviate her sexual inhibitions, and at other times he coerced her to participate by threatening to have her institutionalized if she did not cooperate." (*Bourhis*, at p. 428.) The case settled before trial, and the attorney retained a higher percentage of the settlement amount than he would have been permitted to retain under the MICRA contingency fee limitation in Business and Professions Code section 6146. (*Bourhis*, at pp. 427–428.)

The attorney argued on appeal that "because sexual misconduct by a psychiatrist toward a patient has long been a basis for disciplinary action by the state's licensing agency [citation], any cause of action which is based on such misconduct falls within the proviso, as a 'restriction imposed by the licensing agency.' " (*Bourhis*, *supra*, 40 Cal.3d at p. 436, fn. omitted.) We rejected this argument, explaining that the proviso "obviously was not intended to exclude an action from section 6146 — or the rest of MICRA — simply because a health care provider acts contrary to professional standards or engages in one of the many specified instances of 'unprofessional conduct.' Instead, it was simply intended to render MICRA inapplicable when a provider operates in a capacity for which he is not licensed — for example, when a psychologist performs heart surgery." (*Ibid.*)

We held that "the psychiatrist's conduct arose out of the course of the psychiatric treatment he was licensed to provide." (*Ibid.*)

Lopez argues that a physician assistant who treats patients without adequate supervision renders services "within [a] restriction imposed by the licensing agency." (§ 3333.2, subd. (c)(2).) We disagree. The trial court found that the negligible supervision in this case violated several regulations governing the conduct of supervising physicians and physician assistants. (See, e.g., Cal. Code Regs., tit. 16, §§ 1399.545, subds. (a) ["A supervising physician shall be available in person or by electronic communication at all times when the physician assistant is caring for patients."], (f) ["The supervising physician has continuing responsibility to follow the progress of the patient and to make sure that the physician assistant does not function autonomously."], 1399.540, subd. (d) ["A physician assistant shall consult with a physician regarding any task, procedure or diagnostic problem which the physician assistant determines exceeds his or her level of competence or shall refer such cases to a physician."].) But these regulations, which describe various requirements of appropriate supervision, are not restrictions imposed by a physician assistant's licensing agency. As we explained in *Bourhis*, the proviso was not intended to exclude an action from MICRA "simply because a health care provider acts contrary to professional standards or engages in one of the many specified instances of 'unprofessional conduct.' Instead, it was simply intended to render MICRA inapplicable when a provider operates in a capacity for which he is not licensed . . . ." (*Bourhis, supra*, 40 Cal.3d at p. 436.)

The PAPA provides several examples of restrictions that, if imposed by the licensing agency, would limit a physician assistant's license and place particular services outside the

ambits of MICRA. The Physician Assistant Board may issue a probationary license that imposes "[r]estrictions against engaging in certain types of medical services" or "restrictions on issuing a drug order for controlled substances." (Bus. & Prof. Code, former § 3519.5, subd. (a)(7), (2).) And when a physician assistant is accused of engaging in "unprofessional conduct," including the violation of the supervisory regulations at issue here, the Physician Assistant Board may, after a hearing, impose "probationary conditions upon a [physician assistant] license." (*Id.*, § 3527, subd. (a).) Such probationary conditions would by definition amount to a "restriction imposed by the licensing agency." (Civ. Code, § 3333.2, subd. (c)(2).) But unprofessional conduct, without more, does not. We agree with the Court of Appeal that "the 'restriction' mentioned in this clause must be a limitation on the scope of a provider's practice beyond simply the obligation to adhere to standards of professional conduct." (*Lopez*, *supra*, 46 Cal.App.5th at p. 997, fn. 17.)

If unprofessional conduct of the kind at issue here were alone sufficient to trigger the "within any restriction imposed by the licensing agency" proviso in section § 3333.2, subdivision (c)(2), then medical malpractice plaintiffs could avoid MICRA's damages cap by identifying one member of a health care team who violates a single regulation governing that team. That individual, and potentially the supervising physician under a theory of vicarious liability, would then be subject to unlimited liability for noneconomic damages. Allowing medical malpractice plaintiffs to avoid the MICRA cap in this way would be at odds with MICRA's purpose to "control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on a defendant's liability for

noneconomic damages." (*Salgado*, *supra*, 19 Cal.4th at p. 641.) Neither the language of MICRA nor the legislative history provides any indication that the Legislature intended to enact such a broad exemption from the cap. We hold that a physician assistant does not render services "within [a] restriction imposed by the licensing agency" (§ 3333.2, subd. (c)(2)) simply by engaging in unprofessional conduct, such as the noncompliance with supervisory regulations at issue in this case.

## C.

Lopez cites *Perry* for the proposition that MICRA's cap on noneconomic damages should be construed narrowly. But the Court of Appeal in *Perry* reached no such conclusion. Instead, the court declined to apply MICRA's cap on noneconomic damages to intentional torts because "section 3333.2 applies only in actions 'based on professional negligence,' " and nothing in the legislative history "suggest[s] the Legislature intended to exempt intentional wrongdoers from liability by treating such conduct as though it had been nothing more than mere negligence." (*Perry*, *supra*, 88 Cal.App.4th at p. 669.) No intentional wrongdoing is at issue here.

Lopez also argues that the "purpose of [s]ection 3333.2 is to provide a benefit to health care professionals" by limiting their liability for noneconomic damages and that physician assistants who act without adequate supervision should not "reap the benefits" of MICRA's "protections." But this misapprehends the purpose of the noneconomic damages cap. " '[T]he $250,000 limitation . . . does not reflect a legislative determination that a person injured as a result of medical malpractice does not suffer such damages' " and "is not a

legislative attempt to estimate the true damages suffered by plaintiffs." (*Salgado, supra*, 19 Cal.4th at p. 641.) Nor is it a licensing provision or part of a code of professional standards designed to protect health care providers who adhere to certain standards or comply with particular statutes and regulations. Rather, the $250,000 cap is an "attempt to control and reduce medical malpractice insurance costs." (*Ibid.*) The damages cap inherently concerns health care providers alleged or proven to have engaged in negligent conduct; it is not designed to reward or protect health care providers who, acting within the scope of their education and training, adhere to professional standards while exempting those who do not.

Lopez further argues that because Freesemann's and Hughes's conduct could subject them to professional discipline or criminal liability, the conduct is not "professional negligence" under section 3333.2. But the question of whether a physician assistant's conduct provides a basis for professional discipline or criminal liability is distinct from the question of whether such conduct constitutes "professional negligence" within the meaning of section 3333.2. As we have held, MICRA may apply to the misconduct of a health care provider even if the misconduct could serve as the basis for professional discipline. (*Bourhis, supra,* 40 Cal.3d at p. 436 [rejecting defendant's argument that MICRA does not apply because "sexual misconduct by a psychiatrist toward a patient has long been a basis for disciplinary action by the state's licensing agency"].)

Likewise, the possibility that criminal liability could attach to a health care provider's conduct does not necessarily render MICRA inapplicable. In *Bourhis*, we held that MICRA applied to an action against a psychiatrist who compelled his patient to submit to sexual intercourse by "threatening to have

her institutionalized if she did not cooperate." (*Bourhis*, *supra*, 40 Cal.3d at p. 428.) It is possible that such conduct could give rise to criminal liability. (Pen. Code, § 261.) But we held that the limitation on damages still governed because "the psychiatrist's conduct arose out of the course of the psychiatric treatment he was licensed to provide." (*Bourhis*, at p. 436; see also *Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 351–352; *David M. v. Beverly Hospital* (2005) 131 Cal.App.4th 1272, 1278.)

Neither our case law nor the language of MICRA suggests that the possibility of professional discipline or criminal liability necessarily places a health care provider's actions outside "the scope of services for which [he or she] is licensed" or "within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2).) We thus conclude that the fact that Freesemann's and Hughes's conduct could give rise to professional discipline or criminal liability does not render MICRA inapplicable.

## III.

We also granted review on a second issue: whether a DSA between a supervising physician and a physician assistant is legally effective where the physician is disabled and unable to practice medicine. On closer examination, we decline to consider this issue, which was neither raised in the trial court nor timely raised in the Court of Appeal.

The trial court held that the DSA between Dr. Ledesma and Freesemann was nominally in effect at the time of Freesemann's clinical encounters with O.S. because "[n]either party formally revoked the DSA." Likewise, the trial court held that Dr. Koire and Hughes "had a [supervising

20

physician-physician assistant] relationship" by virtue of their DSA. Lopez raised no challenge to these findings in the trial court. Nor did Lopez challenge these findings in her briefing in the Court of Appeal.

In her petition for rehearing before the Court of Appeal, Lopez argued for the first time that there was no DSA legally in effect between Dr. Ledesma and Freesemann because the DSA was "revoked by operation of law" due to "incapacity of the principal." In her petition for review before this court, Lopez argued for the first time that the DSA between Dr. Koire and Hughes had also been revoked.

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) As a matter of policy, "we normally do not consider any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal." (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 591 (*Flannery*); Cal. Rules of Court, rule 8.500(c)(1).)

Lopez asks us to exercise our discretion to consider an issue of DSA revocation that was neither raised in the trial court nor timely raised in the Court of Appeal. (See *Midland Pacific Building Corporation v. King* (2007) 157 Cal.App.4th 264, 276.) But Lopez's case-specific argument that the disabilities of Dr. Ledesma and Dr. Hughes severed the agency relationship established in their respective DSAs does not raise " 'extremely significant issues of public policy and public interest' [citation] such as may have caused us on infrequent prior occasions to depart from" our ordinary policy. (*Flannery, supra,* 26 Cal.4th at p. 591.) Moreover, it turns on facts not addressed by the trial

court, such as the severity of Dr. Ledesma's disability. We therefore decline to consider this issue.

## CONCLUSION

We affirm the judgment of the Court of Appeal.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**MEEHAN, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Lopez v. Ledesma

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 46 Cal.App.5th 980
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S262487
**Date Filed:**  February 24, 2022

_____

**Court:**  Superior
**County:** Los Angeles
**Judge:** Lawrence P. Riff

_____

**Counsel:**

Esner, Chang & Boyer, Stuart B. Esner; Law Office of Neil M. Howard and Neil M. Howard for Plaintiff and Appellant.

Steven B. Stevens for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson and Zena Jacobsen for Defendants and Appellants.

Reback, McAndrews & Blessey and Thomas F. McAndrews for Defendant and Appellant Glen Ledesma.

LaFollette Johnson De Haas Fesler & Ames and Louis DeHaas for Defendant and Appellant  Suzanne Freesemann.

Peterson Bradford Burkwitz and Avi A. Burkwitz  for Defendant and Appellant Brian Hughes.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Appellants.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association, California Hospital Association, California Academy of Physician Assistants, and the American Medical Association as Amici Curiae on behalf of Defendants and Appellants.

Prindle, Goetz, Barnes & Reinholtz, Jack R. Reinholtz and Douglas S. de Heras for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stuart B. Esner
Esner, Chang & Boyer LLP
234 East Colorado Boulevard, Suite 975
Pasadena, CA 91101
(626) 535-9860

Matthew S. Levinson
Cole Pedroza LLP
2295 Huntington Drive
San Marino, CA 91108
(626) 431-2787