Filed 9/10/25  P. v. McCants CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JAMES McCANTS,<br><br>      Defendant and Appellant. | A172667<br><br>(Contra Costa County<br>Super. Ct. No. 05009332180) |

In 1993, James McCants was committed to a state hospital after he was found not guilty of murder by reason of insanity.  Eventually he was granted outpatient status, which was revoked by the trial court after a hearing held pursuant to a request made under Penal Code section 1608.[1]

In this appeal from the revocation order, McCants's primary argument is that substantive due process requires a finding that he presents a danger to the health and safety of others for outpatient status to be revoked under section 1608; that no substantial evidence was presented to support such a finding; and that the revocation order therefore must be reversed.  He also argues that equal protection requires a finding that he presents a danger to others before outpatient status is revoked.  We will affirm.

---

[1] Statutory references are to the Penal Code unless otherwise stated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

A. *McCants Found Not Guilty by Reason of Insanity*

In September 1993, McCants was charged by information with the murders with malice aforethought of Donna Carroll and a human fetus (§ 187; counts 1 & 2). The information alleged the enhancement that McCants "personally used a vacuum cleaner and telephone a deadly and dangerous weapon" in the commission of the crimes. (§ 12022, subd. (b).) McCants pleaded not guilty and not guilty by reason of insanity, and he denied the enhancement; two experts were appointed to examine him and report to the court.

In October 1993, the information was amended to reduce both counts to second degree murder. McCants then withdrew his not guilty plea; and pleaded no contest to both counts and the enhancement. He was sentenced to two indeterminate terms of 15 years to life, to be served concurrently; a one-year enhancement was imposed but stricken. A bench trial on McCants's sanity followed, at which the parties submitted the issue based on the experts' reports. The court found McCants not guilty by reason of insanity as to the offenses and the enhancement, and found that he had not regained his sanity and was presently a danger to himself and others. In November 1993 McCants was committed to a state hospital pursuant to section 1026 for two concurrent indeterminate terms of 15 years to life, with a one-year enhancement imposed but stricken.

B. *Outpatient Status Granted and Revocation Requested*

In October 2022, the trial court found that McCants would not be a danger to the health and safety of others while under supervision and treatment in the community, and ordered him released to a Conditional

Release Program (CONREP) for community outpatient treatment and supervision in accordance with section 1026.2, subdivision (h).[2]

In October 2024, Contra Costa County CONREP requested revocation of McCants's outpatient status pursuant to section 1608 and informed the trial court that McCants had been rehospitalized pursuant to section 1610.[3] At a hearing in November 2024, McCants waived time; an evidentiary hearing was scheduled for January 2025.

In December 2024, CONREP submitted an annual progress report for McCants recommending revocation of his outpatient status under section 1608 "to allow for an extended stay at" a state hospital. According to the report it was the consensus of the CONREP treatment team that McCants could no longer be safely and effectively treated in the community and that he required additional treatment at a state hospital to regain psychiatric and behavioral stability.

---

[2] Section 1026.2 sets forth the procedures by which a person who has been acquitted by reason of insanity and committed to a state hospital can obtain release on the ground that his or her sanity has been restored.

[3] Section 1608 provides that during outpatient treatment, if the "treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court . . . by means of a written request for revocation of outpatient status." The court must hold a hearing within 15 judicial days and "either approve or disapprove the request." (*Ibid.*) Section 1610 authorizes a person subject to revocation under section 1608 to be confined in a facility designated by the community program director if it is the director's opinion "that the person will now be a danger to self or to another while on outpatient status and that to delay confinement until the revocation hearing would pose an imminent risk of harm to the person or to another." (§ 1610, subd. (a).) The facility "shall continue the patient's program of treatment." (*Ibid.*)

C. *January 2025 Hearing*

The evidentiary hearing on CONREP's revocation request took place on January 9, 2025. The district attorney called three witnesses (Myra Garcia, Robert Nosic, and Brigee Jackson) and McCants called one (Hannah Welch).

1. *Testimony of Myra Garcia*

Dr. Myra Garcia, a clinical psychologist employed as the program director at Gateways Satellite (Gateways), the CONREP program to which McCants had been transferred in March 2024, testified as an expert in psychology and risk assessment. Dr. Garcia characterized Gateways as "essentially an enhanced board-and-care facility." She testified that McCants's placement there was "tenuous since the beginning," explaining that staff told her that he was displaying symptoms of paranoia that made treatment "incredibly difficult despite medication adjustments." McCants denied the paranoid nature of his presentation, offered his own explanation of events, and was unable to consider an alternative or to reason with the treatment team. Dr. Garcia testified that in addition, it appeared that McCants has a "developmental or processing limitation where his memory is affected," which meant he had difficulty remembering events or accepting that he had engaged in problematic behavior. McCants had been referred for neurocognitive testing for dementia, but the screening had not taken place.

Dr. Garcia opined that "the breadth and depth of [McCants's] long-documented mental illness, coupled with cognitive difficulties makes it impossible for him to recognize the paranoid nature of his presentation [and] gets in the way of him being able to meaningful[ly] collaborate with his treatment team and make the gains necessary at this level of care." She opined that McCants "lacked a set of coping skills to implement when he was displaying paranoia"; that staff at Gateways was unable to help him develop

4

those skills; and that his inability to "meaningful[ly] collaborate and treat his illness make him a danger to our clients." Dr. Garcia stated that McCants's "mounting agitation tends to result or follow the paranoia" and that McCants's inability to recognize the symptoms made it "increasingly difficult to treat [him] safely at this level of care," and opined McCants required an adjustment to his medication regime to manage his symptoms and also required extended inpatient treatment in a locked setting that has the resources to manage his symptoms as they develop during the adjustment process.

Dr. Garcia had observed McCants being agitated, but had not seen him behave in a way that was physically dangerous to anyone.

2. *Testimony of Robert Nosic*

Dr. Robert Nosic, a clinical psychologist employed as the program coordinator at Gateways, testified as an expert in forensic psychology. He had met with McCants in October 2024 to discuss reports that McCants had made an inappropriate remark about his forensic clinician and had made inappropriate sexually provocative comments about case managers. During the meeting, McCants identified another patient as a "snitch" and became agitated. It was difficult for Dr. Nosic to work with McCants on ways to manage the agitation, because McCants denied that he was agitated. Based on his interactions with McCants, Dr. Nosic had concerns for the safety of staff members and other patients at Gateways, explaining that McCants's "inability to take in feedback regarding reports that we view as concerning . . . provides the inability for us to work with him on interventions in order not to escalate a violent situation." McCants had not engaged in any physical violence at Gateways, but his interactions with some of his peers "were not in line with the rules of the program," and he often was not willing to meet with

5

his clinician in her office, which was significant as a reflection of his failure to comply with the recommendations of the treatment team.

Dr. Nosic had requested a psychological assessment of McCants to determine whether he had dementia or other cognitive impairments and what role psychosis or McCants's antisocial personality disorder were playing in his behaviors. Dr. Nosic testified that the assessment would be important for deciding what level of care McCants needed and "how to address some of the barriers we ran into." He testified that McCants appeared to have memory problems; that the treatment team had discussed the possibility that McCants was developing dementia; and that some of the behavior McCants displayed, including unwillingness to believe facts he was told, inability to recall things, and agitation when told that his views were incorrect, could be due to cognitive decline, or to schizophrenia, or "it could be more intentional because of the antisocial personality disorder."

3    *Testimony of Brigee Jackson*

Dr. Brigee Jackson, a clinical psychologist employed as the community program director for Contra Costa CONREP, testified as an expert in psychology, risk assessment, and California's Conditional Release Program. Dr. Jackson was familiar with McCants's progress and treatment in the community as a result of her work in coordinating his placement and care in the years since he had been released to CONREP. She wrote McCants's December 2024 annual progress report and the request for revocation of his outpatient status. Based on collaboration with McCants's treatment team, she determined that McCants's discharge goals, which included anger and impulsivity management, relapse prevention planning, and developing or broadening insight into his mental health condition had been largely unmet. Dr. Jackson's report incorporated a risk assessment evaluation of McCants

6

that she conducted, considering historical factors related to violent behaviors, clinical factors related to violence, and risk management factors related to the risk of violence. She opined that McCants would be rated as "high future violence or case prioritization if released from CONREP, high serious physical harm risk, and moderate imminent violence risk." Based on her interactions with McCants and the risk assessment, it was Dr. Jackson's opinion that McCants represented "a danger to the health and safety of the community that's elevated above that which can be effectively provided by community outpatient treatment," and that he required an extended stay at a state hospital to address his discharge goals.

Dr. Jackson testified that McCants's diagnoses include borderline cognitive functioning, that he was especially weak in auditory comprehension, and that he appeared to be suffering from memory loss. He was on a wait list for "the full neuro and cognitive battery of testing." She testified that if testing showed McCants to be suffering organic cognitive decline, a conservatorship could be appropriate for him.

4. *Testimony of Hannah Welch*

Hannah Welch, a licensed clinical social worker who worked with McCants at Napa State Hospital since his admission there in October 2024, testified that McCants initially demonstrated a "decreased frustration tolerance" and was irritated about his circumstances and unsure of what was happening, which "impressed as somewhat inpatient behavior." It was difficult to tell whether McCants was unwilling to retain new information or was unable to retain information because of memory problems; his agitation made it appear that he was unwilling. After about a month, McCants showed an increased frustration tolerance, but continued to have difficulties

7

retaining new information and occasionally demonstrated signs of paranoia relating to his belief that CONREP was "setting [him] up" for revocation.

Welch stated that the barrier to McCants advancing in his treatment was his difficulty developing insight into his circumstances; Welch opined that this could be the result of memory loss and that she would not be surprised if testing showed that McCants was experiencing some kind of organic cognitive decline. She testified that neurocognitive testing had been ordered for McCants and that if he remained at Napa State Hospital, she would refer him to a geriatric or medical unit.

Welch had not observed McCants yell or act in a threatening manner or engage in any unsafe behaviors, and she stated that McCants had not received any incident management reports for behavioral reasons.

5. *Argument and Ruling*

The district attorney argued that the People had met their burden under section 1608 to show by a preponderance of the evidence that McCants required extended inpatient treatment. The district attorney further argued that "at least a couple" of the witnesses testified they had concerns about the safety of staff members and other patients at Gateways if McCants were to remain there.

McCants's counsel argued that under *Foucha v. Louisiana* (1992) 504 U.S. 71 (*Foucha*) a finding of dangerousness is constitutionally required for the revocation of outpatient status, and because there was no evidence that McCants was dangerous the revocation request should be denied.

The trial court granted the request to revoke McCants's outpatient status under section 1608, stating, "I do understand that that means that we might be back here very, very soon on a [section] 1026.2 with additional information as to how Mr. McCants has been doing." This was apparently a

8

reference to the fact that by statute, McCants or the medical director of the state hospital might make a subsequent application for McCants to be released to outpatient treatment. (§ 1026.2, subd. (a).) The court approved the revocation of McCants's placement at Gateways, but declined to find that McCants must remain at the state hospital, stating, "I authorize his placement in any appropriate treatment facility. And I make no finding that the hospital is the least restrictive placement. I'm not finding that it is currently the least restrictive placement." The court subsequently issued a written order granting the revocation request and ordering CONREP and the Department of State Hospitals to consider placing McCants at an Institute of Mental Disorder or other inpatient facility and report to the court explaining their opinion as to the appropriate inpatient level of care.

McCants timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

A defendant found not guilty by reason of insanity is committed to a state hospital " 'to treat his mental illness and to protect him and society from his potential dangerousness.' " (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432.) A defendant who has been adjudicated not guilty by reason of insanity and committed for treatment "may be released from a state hospital upon either (1) the restoration of sanity pursuant to the provisions of section 1026.2; (2) expiration of . . . 'the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted' [citation]; or (3) approval of outpatient status pursuant to the provisions of section 1600 et seq." (*Ibid.*)

A two-step process applies to an application for release on the basis of restoration of sanity. The first step requires the applicant to show by a

9

preponderance of the evidence that he or she would not be "a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subd. (e); see *People v. Sword* (1994) 29 Cal.App.4th 614, 621 (*Sword*) [discussing burden of proof].) An applicant who meets that burden is placed in an outpatient program, and at the end of one year the trial court may discharge the defendant, or order the defendant confined in a treatment facility, or renew its approval of outpatient status. (§ 1606; *Sword, supra,* 29 Cal.App.4th at p. 621.)

However, the court may revoke outpatient status under section 1608, the statute at issue in this case, or section 1609, which governs revocation proceedings initiated by the prosecution.[4] Section 1608 governs requests to revoke outpatient status based on the opinion of the defendant's outpatient treatment supervisor "that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision." (§ 1608.) Section 1609, not at issue here, provides for the revocation of outpatient status based on the opinion of the prosecutor "that the person is a danger to the health and safety of others while on" outpatient status. (See *People v. DeGuzman* (1995) 33 Cal.App.4th 414, 419 (*De Guzman*) ["section 1608 focuses on an outpatient's well-being, while section 1609 is concerned with protecting community safety"].)

The revocation of outpatient status under section 1608 "requires a finding that the patient needs extended inpatient treatment or refuses to

---

[4] Once outpatient status has been revoked, an individual may apply to be returned to outpatient status under section 1026.2, subdivision (e), which, as noted above, requires the individual to prove by a preponderance of the evidence that he or she would not be "a danger to the health and safety of others . . . while under supervision and treatment in the community."

accept further outpatient treatment. It does not require the court to find that the patient is a danger to the health and safety of others." (*DeGuzman*, *supra*, 33 Cal.App.4th at p. 420.) At a revocation hearing under section 1608, the People bear the burden of proof by a preponderance of the evidence. (*Ibid.*)

In reviewing an order revoking outpatient status under section 1608 we uphold the trial court's factual findings if they are supported by substantial evidence. (*DeGuzman*, *supra*, 33 Cal.App.4th at p. 420.) Here, however, McCants does not dispute that substantial evidence supports a finding that McCants required extended inpatient treatment. Instead, McCants raises a constitutional challenge to the interpretation of section 1608 as not requiring a finding that the patient is a danger to others. We review this challenge de novo. (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 857 [questions of statutory interpretation reviewed de novo]; *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 [de novo review applies to "construing constitutional and statutory provisions"].)

B.    *Due Process*

"So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience' [citation], or interferes with rights 'implicit in the concept of ordered liberty.' " (*U.S. v. Salerno* (1987) 481 U.S. 739, 746.) In accordance with principles of due process, an individual found not guilty by reason of insanity " 'is entitled to release when he has recovered his sanity or is no longer dangerous,' [citation]; *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous but no longer." (*Foucha*, *supra*, 504 U.S. at p. 77.)

McCants contends that to comport with due process, the requirements for the granting of outpatient status under section 1026.2, subdivision (e),

and the requirements for revocation of outpatient status must be "symmetrical," and that "[d]angerousness must apply in both directions." He contends that just as section 1026.2, subdivision (e) required him to show that he would not be a danger to others due to mental disorder while under outpatient treatment, to comport with substantive due process, the revocation of his outpatient status under section 1608 must require the state to show that he is dangerous to others under outpatient status. Thus, McCants concludes, his outpatient status could not be revoked under section 1608 absent a finding by the trial court that he currently presents a danger to others, even though the statute itself does not require any such finding.

We are not persuaded. McCants's argument fails to account for the context in which these statutes are applied. A finding that McCants was and is dangerous to others is implicit in the initial determination that he was not guilty by reason of insanity. That finding of dangerousness can be negated by a finding that his sanity has been restored, "which means [he] is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." (§ 1026.2, subd. (e) [§ 1026.2 "presumes that [an individual found not guilty by reason of insanity] is a danger to others"].) However, an order granting outpatient status under section 1026.2, subdivision (e) is not a determination that sanity has been restored: it is instead a determination that the defendant would not be dangerous "while under supervision and treatment in the community." (§ 1026.2, subd. (e).) Nor is an order granting outpatient status under section 1026.2, subdivision (e) a determination that the defendant is not dangerous: "To say that it has been determined that a defendant . . . will not be a danger while receiving supervision and treatment is certainly not to say that he will not be a danger under any circumstances, regardless of treatment." (*People v. Harner* (1989) 213 Cal.App.3d 1400, 1407

12

[discussing outpatient status for mentally disordered sex offenders]; see *People v. Superior Court* (*Henry*) (1993) 12 Cal.App.4th 1308, 1312 ["[a] person may remain an outpatient as long as he will not be a danger to others *and* will benefit from an outpatient program," italics added].)

Thus, McCants's release to outpatient treatment in 2022 was not based on a finding that he was not dangerous; it was based on a finding that he would not be dangerous under the supervision provided by an appropriate outpatient treatment program. (See § 1026.2, subd. (e) [directing court to order placement "with an appropriate forensic conditional release program"].) In other words, there was a finding that, during a period of restriction to allow further evaluation, appropriate outpatient treatment would not only constitute treatment of his mental illness but would " 'cause no undue hazard to the community.' " (*Sword*, *supra*, 29 Cal.App.4th at p. 620.)

Due process " 'requires that the nature . . . of commitment bear some reasonable relation to the purpose for which the individual is committed' " and the purpose for committing an individual found not guilty by reason of insanity is twofold: "to treat the individual's mental illness and protect him and society from his potential dangerousness." (*Jones v. U.S.* (1983) 463 U.S. 354, 368 (*Jones*); see *People v. Beck* (1996) 47 Cal.App.4th 1676, 1685 (*Beck*) ["[i]n light of the strong public interest in avoiding premature release of mentally disordered acquittees and the uncertainties in psychiatric evaluation," the procedures set forth in section 1026.2, subdivision (e) comport with due process and *Foucha* because they " 'bear some reasonable relation to the purpose for which [McCants was] committed' "].)

Section 1608 provides that outpatient treatment can be revoked based on a finding that outpatient treatment is in fact not appropriate for the defendant, either because the defendant requires extended inpatient

13

treatment or because the defendant refuses to accept further outpatient treatment. In such circumstances, outpatient treatment is not serving one of the two purposes for which an individual found not guilty by reason of insanity was committed—the treating of the defendant's mental illness—and therefore the revocation of outpatient status does not infringe on the defendant's constitutional right to due process. (*Jones, supra*, 463 U.S. at p. 368.)

In sum, we see no due process violation in the revocation of McCants's outpatient status under section 1608 based on the trial court's finding that he required inpatient treatment. And because we conclude that the revocation of outpatient status under section 1608 does not require a finding by the trial court that the patient is dangerous to others, we do not reach McCants's argument that no substantial evidence was presented to support such a finding.

C. *Equal Protection*

For the first time on appeal, McCants argues that revoking his outpatient status without a finding of dangerousness violated his constitutional right to equal protection.

McCants asserts that he is similarly situated to an offender with a severe mental health disorder (often referred to as OMHD) who is subject to commitment to the Department of State Hospitals (Department) for treatment as a condition of parole. (§ 2962.) An OMHD individual receives inpatient treatment unless the Department certifies that "there is reasonable cause to believe the parolee can be safely and effectively treated on an outpatient basis." (§ 2964, subd. (a).) The revocation of outpatient treatment for such offenders is governed by procedures different from those that apply to an individual found not guilty by reason of insanity: the community

14

program director "may place the parolee, or cause the parolee to be placed, in a secure mental health facility if the parolee can no longer be safely or effectively treated in the outpatient program, and until the parolee can be safely and effectively treated in the program." (*Ibid.*) Within 15 days of such action, a hearing is to be conducted (by the Department) to determine "whether the parolee can be safely and effectively treated in the program." (*Ibid.*) McCants argues that because he is similarly situated to an OMHD individual for purposes of the revocation of outpatient status, and because safety must be considered in revoking the outpatient status of an OMHD individual, safety must likewise be considered in revoking his outpatient status as an individual found not guilty by reason of insanity.

McCants also asserts that he is similarly situated to persons facing civil commitment under the Lanterman-Petris-Short Act.

Although a defendant may forfeit a constitutional claim by failing to timely assert it in the trial court (*People v. McCullough* (2013) 56 Cal.4th 589, 593), "we have discretion to consider the claim on the merits if it presents a pure question of law and it is unclear whether the appellant had the opportunity to raise the argument below." (*People v. Cannon* (2022) 85 Cal.App.5th 786, 794, citing *In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.) McCants's equal protection argument raises a pure question of law, but he did not raise it below even though he had the opportunity to do so. We are not persuaded by his suggestion, unsupported by any citation to authority, that his counsel's "raising the due process issue was sufficient to draw the trial court's attention to" the equal protection claim.

Further, McCants offers no analysis to support his contentions that he is similarly situated to OMHD individuals and those facing civil commitment, stating simply that he "contends that his constitutional equal protection right

15

was violated, because patients found not guilty by reason of insanity should not have their outpatient status revoked unless the trial court finds the patient represents a danger to others." Although McCants "relies on Welfare [and] Institutions Code section 5325.1, subdivision (a) and [*Beck, supra,*] 47 Cal.App.4th 1676 in this regard," he offers no discussion of the statute, and neither discussion nor a pinpoint citation to *Beck*, which rejected an equal protection challenge to the minimum one-year CONREP term that section 1026.2, subdivision (e) imposes on individuals found not guilty by reason of insanity. (*Beck* at pp. 1680-1681, 1687.)

Accordingly, McCants has forfeited his equal protection claim not only by failing to assert it below, but also by failing to provide appropriate appellate argument to support his contentions. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["citing cases without any discussion of their application to the present case results in forfeiture"; "[w]e are not required to examine undeveloped claims or to supply arguments for the litigants"].) We decline to reach the issue.

## DISPOSITION

The challenged order is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A172667, *People v. McCants*

17