Filed 3/20/23  P. v. Mendez CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GABRIEL MENDEZ,<br><br>    Defendant and Appellant. | B318512<br><br>(Los Angeles County<br>Super. Ct. No. KA004460) |

APPEAL from an order of the Superior Court of Los Angeles County, Rob B. Villeza, Judge.  Affirmed with directions.

Boyce & Schaefer and Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Gabriel Mendez appeals from a postjudgment order denying his petition for resentencing under former Penal Code section 1170.95[1] (now section 1172.6) as to his conviction of second degree murder. In 1990 Mendez pleaded no contest to second degree murder pursuant to a negotiated plea agreement and was sentenced to an indeterminate state prison term of 15 years to life. In 2019 Mendez petitioned to vacate his murder conviction under former section 1170.95 on the basis he was convicted under the natural and probable consequences doctrine and could not now be found guilty of murder in light of changes in the law. In *People v. Mendez* (Feb. 21, 2021, B299684) (nonpub. opn.) (*Mendez*), we reversed the trial court's summary denial of Mendez's petition and remanded for the court to appoint counsel for Mendez, to issue an order to show cause, and to hold an evidentiary hearing to determine whether to vacate Mendez's murder conviction.

After an evidentiary hearing, the trial court concluded Mendez was not eligible for resentencing because he was a direct aider and abettor in the implied malice murder of Jessie Jimenez. Mendez contends the court erred in admitting statements made by Mendez during a 2015 parole eligibility hearing, and substantial evidence does not support the court's findings. We affirm.

---

[1] All undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Killing*

We described the facts presented at trial in our nonpublished opinion in *People v. Valles* (Aug. 24, 1993, B058344) (nonpub.) (*Valles*).  The following facts are undisputed.[2]

Sometime after midnight on May 12, 1990 two carloads of young men pulled into the parking lot of a liquor store in Pomona.  The men belonged to gangs that were rivals of the Pomona Michoacan Rifa (PMR) gang.  Mendez, Ramon Magana, and Richard Ortega belonged to the 12th Street gang.  Ricardo Valles, Alberto Valles (Alberto), and Victor Caudillo belonged to the Pomona Sur gang.  Jimenez's family members were associated with the PMR gang.  Jimenez and a female companion had just completed a purchase inside the store.  Jimenez left the store but ran back inside when he saw the men approach the store.

Mendez and the other men followed Jimenez inside the store and threw beer cans at him.  Jimenez sought refuge behind the cashier's counter.  The men grabbed merchandise off the shelves and threw beer cans, six packs of beer, and other items at Jimenez as he lay on the floor curled in a fetal position.  Two or

---

[2]    Because Mendez entered a negotiated plea on the fourth day of the trial (which continued as to Ricardo Valles), only a portion of the trial testimony is part of Mendez's record of conviction.  We include in our summary the undisputed facts adduced at trial, including facts elicited after the fourth day that were considered by the superior court without objection and cited by Mendez on appeal.

more of the men started beating and kicking Jimenez.[3]  One of the men yelled "12" in Spanish and another made a gang sign.

Valles pulled out a gun, leaned over the counter, and prepared to fire the gun at Jimenez.  However, Valles struggled with the gun, and it did not fire.  Valles ordered the other men to "hold the son of a bitch," and he fired the gun into the temple of Jimenez's head.  Jimenez died a few days later.

B.  *The Information, Plea, and Sentencing*

The amended information charged Valles, Mendez, Alberto, Ortega, Caudillo, and Magana with first degree murder (§ 187, subd. (a); count 1); conspiracy to commit murder (§§ 182, former subd. (1), 187, subd. (a); count 2); and conspiracy to commit assault with a deadly weapon (§§ 182, former subd. (1), 245, subd. (a)(1); count 3).  The information alleged 11 overt acts as to each of the conspiracy charges.  The information specially alleged Valles personally used a firearm (§ 12022.5) and, as to Mendez and his codefendants, a principal was armed with a firearm during the commission of the offense (§ 12022, subd. (a)(1)).  The information also alleged the offenses were committed in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1).  (*Valles, supra*, B058344.)

---

[3]  We concluded in *Valles* that Mendez was part of the group that was beating and kicking Jimenez.  However, whether Mendez was one of the men who beat and kicked Jimenez was a disputed fact at the evidentiary hearing.  On appeal, Mendez argues a witness to the shooting said only two men were kicking and beating Jimenez, and the prosecutor argued the two men were Alberto and Caudillo.

4

The trial commenced as to all defendants on October 2, 1990. On the fourth day of trial (October 5), Mendez and the other defendants except for Valles entered into negotiated pleas of guilty or no contest. Mendez pleaded no contest to second degree murder and admitted the allegation a principal was armed with a firearm. As part of the plea, Mendez and his attorney each stipulated that the probation report and the preliminary hearing transcript provided a factual basis for the plea. The trial court found Mendez made a knowing, voluntary, and intelligent waiver of his constitutional rights, and based on the first three days of testimony, there was a factual basis for the plea. Before sentencing Mendez, the trial court read into the record a letter Mendez admitted writing to "Ralph" stating, "As you probably know by now, that I got 15 to life but I don't sweat it as long as I know I am alive and that Vato is dead."[4]

The trial court sentenced Mendez pursuant to the negotiated plea to 15 years to life for second degree murder, and it imposed and stayed a one-year term for the firearm enhancement. The court dismissed the remaining allegations. Mendez did not attend the remainder of the trial.[5]

---

[4] Although the record does not reflect whether "Vato" specifically referred to Jimenez, Mendez does not dispute that it did.

[5] The jury found Valles guilty of first degree murder and conspiracy to commit murder but not guilty of conspiracy to commit assault with a deadly weapon. The jury found true the firearm-use and gang allegations. On appeal, we affirmed Valles's judgment of conviction, but we concluded as to Mendez the trial court violated his plea agreement because it discussed with Mendez at the time of his plea that his parole term would be

5

C. *Mendez's Petition for Resentencing*

On February 7, 2019 Mendez, representing himself, filed a form petition for resentencing and supporting declaration seeking to vacate his murder conviction and to be resentenced in accordance with recent statutory changes relating to accomplice liability for murder. In his petition, Mendez declared he "pled guilty or no contest to 1st or 2nd degree murder in lieu of going to trial because [he] believed [he] could have been convicted of 1st or 2nd degree murder at trial pursuant to the felony murder rule or the natural and probable consequences doctrine"; and he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019." Mendez requested the court appoint counsel for him. Mendez argued in his supporting memorandum that he pleaded no contest to second degree murder based on the natural and probable consequences doctrine; he had no intent to kill; he was

---

limited to five years, but in fact the Board of Prison Terms had authority to place Mendez on parole for up to life. (*Valles, supra*, B058344.) We reversed the judgment as to Mendez and remanded to allow him the option to withdraw his plea and have the charges reinstated. (*Ibid*.) On remand Mendez elected not to withdraw his plea, and the judgment was reinstated. We note that although the trial court had stayed the one-year firearm enhancement as part of the negotiated plea, the March 24, 1994 abstract of judgment reflects that the enhancement was imposed, not stayed. Therefore, the abstract of judgment must be corrected to reflect the sentence imposed. (See *People v. Jones* (2012) 54 Cal.4th 1, 89 ["When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties."].)

not a major participant; and he did not act with reckless indifference to human life. Mendez also submitted a declaration in which he stated "[t]hat during the offense [he] was unaware that the actual killer had a firearm."

On May 22, 2019 the People filed a 25-page response to Mendez's petition in which they argued Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was unconstitutional, and in any event, Mendez was ineligible for relief under former section 1170.95 because the testimony showed Mendez and Magana beat Jimenez in the liquor store and threw cans and packages of beer at him, leading to Valles shooting Jimenez. Further, Mendez had a motive to harm Jimenez as a rival gang member. Thus, they argued, Mendez was a direct aider and abettor of the murder with the intent to kill. The People attached over 1,000 pages of exhibits to their petition, including significant portions of the preliminary hearing and trial transcripts, as well as the transcripts of Mendez's 2002 and 2015 parole hearings. The People also quoted the letter the trial court read at sentencing in which Mendez wrote to a friend he was comfortable with his sentence as long as he knew that Vato was dead.

On May 24, 2019 the trial court summarily denied Mendez's petition for resentencing.[6] The court did not appoint counsel for Mendez. Mendez appealed.

D.    *Mendez I*

In *Mendez I* we concluded Mendez made a prima facie showing he was entitled to relief under former section 1170.95

---

[6]    Judge Steven D. Blades ruled on the petition. Judge Gregory C. O'Brien presided over the trial but retired in 2005.

7

and the record of conviction did not conclusively show as a matter of law Mendez harbored an intent to kill. We noted the trial court erred in considering statements made by Mendez during his 2015 parole hearing as part of its prima facie review, because those statements were not part of Mendez's record of conviction.

We reversed and remanded for the trial court to appoint counsel for Mendez, issue an order to show cause, and hold a hearing to determine whether to vacate Mendez's murder conviction. (*Mendez I*, B299684.)

E.    *The Evidentiary Hearing and Ruling*

At the February 16, 2022 evidentiary hearing, the prosecution introduced into evidence a surveillance video of the May 12, 1990 incident as well as transcripts of the preliminary hearing, the first four days of trial (from October 2 through 5, 1991), Mendez's plea hearing, Mendez's sentencing, and portions of Mendez's 2015 parole hearing. Without objection by Mendez, the trial court took judicial notice of our decision in *Valles, supra*, B058344. Mendez did not present any new or additional evidence.

1.    *The preliminary hearing testimony*

Eunsup Yoon, the owner of the liquor store, testified at the preliminary hearing. Around midnight on May 12, 1990 Yoon was at the liquor store in his office, which was located next to the cash register and behind the counter. Yoon saw the incident through a window in his office wall behind the counter. He saw Jimenez leave the store, then run back inside. About six young men followed Jimenez into the store, and Jimenez ran behind the cash register. The men began to throw beer cans and candy bars.

Two of the men followed Jimenez behind the counter and began to hit and kick him. Jimenez was hunched over as they beat him, and he appeared to become unconscious. Then another man shot Jimenez in the head.

During the testimony of Pomona Police Investigator Dexter Cole, the prosecution played the surveillance video of the incident. Cole identified each of the codefendants as the video played.

2.    *The trial testimony*

At trial, Yoon provided testimony consistent with his preliminary hearing testimony about the events he witnessed in the liquor store. According to Yoon, Jimenez was "all curled up on the ground" in a fetal position behind the counter while the two men were beating him. Yoon testified only two men were hitting and kicking Jimenez behind the cash register. At the time the man fired the gun, the two men who were beating Jimenez had already left from behind the cash register. The shooter leaned over the counter to shoot Jimenez, who was on the ground.

Mendez's attorney stipulated that Mendez's fingerprints were found on an empty can of beer recovered from the liquor store. Pomona Police Detective Frank Terrio testified the can was recovered in a pool of liquid and appeared to have burst and spilled. The location and condition of the can were consistent with the can having been thrown across the store. Detective Terrio recovered a single 0.25-caliber casing from the liquor store.

3.     *The surveillance video*

At the evidentiary hearing, the prosecutor played the surveillance video for the court.  In the video, Jimenez is seen inside the liquor store with a female companion.  He makes a purchase and then exits the store.  Jimenez then runs back into the store and disappears off camera in the lower right corner of the frame.  Mendez enters the store (dressed in black with a black cap) and throws merchandise in the direction Jimenez ran.  Mendez is followed by Magana, Valles, Caudillo, and then Alberto.  While Mendez crosses his arms in front of his chest to form an "X," Valles runs around the other men and disappears off camera at the bottom of the frame.  Mendez pauses briefly, gesturing with his hand toward the door as Caudillo and Magana move into the store, toward the bottom of the frame.  Magana, Caudillo, then Mendez throw merchandise toward the lower left corner of the frame.

At this point Mendez disappears from view on the right side of the frame, passing by Valles just as Valles reemerges at the lower right corner of the frame (wearing a white shirt and black cap).  Valles's back is partially turned toward the camera, and he is looking down at a gun in his hands.  Caudillo again throws merchandise toward the bottom of the frame, then disappears off camera at the bottom of the frame.  As Valles struggles with the gun, Alberto lifts what appears to be a six-pack of beer over his head and heaves it in the same direction as the others.  Alberto then briefly disappears then reemerges and walks toward the door.  While Alberto walks toward the door, Valles briefly kneels, bangs the guns on the ground, and then raises it above his head as he attempts to manipulate the slide on the firearm.

10

Valles continues to struggle with the gun as Magana reemerges from the bottom right corner of the frame. Magana pushes Valles a short distance back toward the door, then walks past Valles toward the door while Valles continues to manipulate the gun in his hands. Alberto moves from the door toward the bottom of the frame, then disappears again in the bottom right corner of the frame. Valles moves closer to the bottom of the frame (where the merchandise had been thrown), then he disappears off camera. Caudillo emerges from the bottom of the frame and stops in the middle of the liquor store. About two seconds later, a gunshot is heard. More than 20 seconds elapses between when Valles is first seen fidgeting with the gun and when the gunshot is heard. After the gunshot, Magana exits the store, followed quickly by Caudillo. Then Alberto, followed by Mendez, reemerge from the lower right corner of the frame and run through the store and out the door. They are followed about two seconds later by Valles, who runs in a similar path from the bottom of the frame and out the door.

4.   *Cole's testimony at the evidentiary hearing*

As the surveillance video played, Cole identified Mendez as "the first one that entered the liquor store" and the second to last one to leave, exiting immediately before Valles. Cole noted that although Mendez disappeared off camera after throwing the merchandise, it appeared that "he followed the path of travel of the victim."

5.   *Mendez's 2015 parole hearing*

During his 2015 parole hearing, Mendez admitted he chased Jimenez into the store, threw a beer can at him, and

11

"kicked him and hit him with [his] fist." Mendez explained he "was motivated by a desire for respect and a perverted duty" to the 12th Street gang. Mendez had believed Jimenez identified the homes of 12th Street gang members to Jimenez's family members, who were rival gang members that "would return and shoot at the homes."

6. *Arguments of counsel*

After the presentation of testimony, the prosecutor argued Mendez was guilty as a direct aider and abettor of first degree murder, who acted with the express intent to kill Jimenez, or of second degree murder, acting with implied malice as he assisted Valles in carrying out the shooting. The prosecutor asserted that "anybody who's involved in this melee [and] sees Mr. Valles pull out the weapon, struggle with the weapon, clear the jam, go to the counter, lean forward over the counter, and then execute Mr. Jimenez with a shot to the head was on notice of what was about to happen . . . ." Mendez kept Jimenez "isolated and vulnerable, surrounded by . . . gang members," which allowed Valles time to clear the jammed gun and kill Jimenez. Mendez waited until Jimenez had been shot to exit the liquor store, making him one of the last gang members to leave, followed only by Valles. Mendez was motivated by his belief members of Jimenez's family were rival PMR gang members and Jimenez had identified the homes of 12th Street gang members to his relatives.

Defense counsel argued there was not proof beyond a reasonable doubt to support any of the prosecution's theories. Mendez intended only to "put a beat down" on Jimenez. There was no evidence Mendez acted with the intent to kill as required to prove first degree murder. And there was no evidence Mendez

12

knew Valles had a firearm. Defense counsel asserted Mendez could only have been convicted of murder under the abrogated natural and probable consequences doctrine. Although Mendez threw merchandise at Jimenez just after entering the store, he then turned to gesture toward his compatriots to indicate it was time to leave, which showed Mendez did not intend to kill Jimenez. There was no evidence showing Mendez was behind the counter "beating up Jimenez," noting that at trial the prosecutor had argued it was Alberto and Caudillo behind the counter, not Mendez. Further, the facial expressions and behavior of those visible in the video while Valles struggled with the gun, including Magana—who pushed Valles toward the door—suggested they were surprised by Valles's escalation of the encounter. Defense counsel argued the evidence likewise did not establish Mendez was a direct aider and abettor who acted with implied malice, asserting, "This was a beat down that took a wrong turn. And it's a classic example of natural and probable consequences."

In his rebuttal, the prosecutor argued defense counsel's position Mendez was surprised by the killing was belied by Mendez's statement in his letter to Ralph that he did not "'sweat'" his sentence because he was alive and Vato was dead, which showed Mendez's sense of satisfaction and accomplishment about the killing.

### 7. *The trial court's ruling*

The trial court[7] found the People met their burden to prove beyond a reasonable doubt Mendez was guilty of second degree

---

[7] Judge Rob B. Villeza presided over the evidentiary hearing and ruled on Mendez's petition.

13

implied malice murder "by engaging in conduct that endangered the life of another and acting with a conscious disregard for life," and therefore Mendez was ineligible for resentencing.[8] The court noted Mendez was a member of the 12th Street gang, Jimenez's relatives were members of the rival PMR gang, and Mendez believed Jimenez had identified to his relatives the homes of Mendez's fellow gang members for targeted shootings by PMR. Mendez and others "threw beer cans and other items at Jimenez as he tried to hide." Mendez was present when Valles's gun jammed, and Mendez "continued to beat Jimenez while Valles tried to clear the jam, to the point Jimenez was described as unconscious and in a fetal position when Valles told others to hold Jimenez." Mendez "did not flee when Valles pointed the gun and shot Jimenez," instead waiting until after Valles shot Jimenez to run out of the store.

The court found Mendez's conduct showed a conscious disregard for life, reasoning, "If [Mendez] was concerned that his actions might endanger Jimenez's life, he would have run out when he threw items at Jimenez, or at the very least when he saw Valles with the gun and saw the gun misfire. Instead, he continued to assault Jimenez on the floor. While it took Valles, based upon a review of the video, it appeared to be almost 28 seconds to clear the gun and fire." The court reasoned the totality of the circumstances, including the "proximity of

---

[8] The trial court observed that "the evidence also suggests the defendant shared with Valles an expressed intent to kill at the time Jimenez was attacked," which would support a first degree murder conviction, but the People had not presented sufficient evidence to prove this theory beyond a reasonable doubt.

14

[Mendez] to Valles as he cleared the gun, . . . [Mendez] leaving the store with Valles, and [Mendez's] statement that he was content with the sentence as long as Jimenez was dead," was sufficient to prove Mendez "knew Valles had a gun at some point during the altercation and that he intended to use the gun on Jimenez."

Mendez timely appealed.

## DISCUSSION

A.    *Senate Bill 1437 and Section 1172.6 (Former Section 1170.95)*

Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847-848 (*Gentile*).)  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder except under the revised felony-murder rule as set forth in section 189, subdivision (e). That section requires the People to prove specific facts relating to the defendant's individual culpability:  The defendant was the actual killer (§ 189, subd. (e)(1)); although not the actual killer, the defendant, with the intent to kill, assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in an underlying felony listed in section 189, subdivision (a), and acted with reckless indifference to human life "'as described in subdivision (d) of . . . Section 190.2,'" the felony-

murder special-circumstance provision (§ 189, subd. (e)(3)).
(See *Strong*, at p. 708.)

Senate Bill 1437 also provided a procedure (now codified in section 1172.6) for an individual convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189. (*Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 847.) The ameliorative changes to the law now apply to attempted murder and voluntary manslaughter. (§ 1172.6, subd. (a).)

If the section 1172.6 petition contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the court must appoint counsel to represent the petitioner upon his or her request pursuant to section 1172.6, subdivision (b)(3). Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1172.6, subd. (c).) Where a petitioner makes the requisite prima facie showing he or she falls within the provisions of section 1172.6 and is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subds. (c) & (d)(1).)

Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the

prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." "Thus, 'it is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing . . . .'" (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984; accord, *People v. Henley* (2022) 85 Cal.App.5th 1003, 1016; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3); see *Henley*, at p. 1013; *Vargas*, at p. 952.)

On appeal from an order denying a section 1172.6 petition, we review the trial court's factual findings for substantial evidence. (*People v. Henley, supra*, 85 Cal.App.5th at p. 1017; *People v. Ramirez, supra*, 71 Cal.App.5th at p. 985.) "'We "must review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"'" (*Ramirez*, at p. 985 [reviewing for substantial evidence trial court's factual finding that petitioner was not eligible relief under former § 1170.95

17

because he was a major participant and acted with reckless indifference to human life]; accord, *Henley*, at p. 1017; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 277.) "[W]e look to whether the prosecution has introduced sufficient evidence of ""reasonable, credible, and of solid value"" to 'support a finding beyond a reasonable doubt' that [petitioner] had the requisite mental state." (*People v. Clark* (2016) 63 Cal.4th 522, 618; accord, *Henley*, at p. 1017; *Ramirez*, at p. 985.)

B.  *The Trial Court Did Not Err in Admitting Mendez's Statements Made During His 2015 Parole Eligibility Hearing*

Mendez contends the court prejudicially erred in admitting into evidence the statements made by Mendez during his 2015 parole hearing based on the use immunity rule articulated in *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*) and its progeny. We decline to extend *Coleman* to section 1172.6 evidentiary hearings.

In *Coleman*, the Supreme Court held a defendant's statement at a probation revocation proceeding was not admissible against him at trial to prove guilt on the related charges. (*Coleman*, *supra*, 13 Cal.3d at p. 889.) The court reasoned that a defendant should not be forced to choose between the privilege against self-incrimination at trial and the right to be heard at a probation revocation hearing. (*Id.* at p. 878.) To alleviate the tension between these competing rights, the court fashioned a "judicial rule of evidence" that a probationer's revocation hearing testimony is inadmissible during the prosecution's case-in-chief "to encourage the fullest possible *truthful* disclosure of relevant facts and circumstances at the

18

revocation hearing by allowing a probationer who does testify at his revocation hearing nonetheless to enjoy unimpaired the full protection of the privilege against self-incrimination at his subsequent trial." (*Id*. at pp. 879, 892.)

The Courts of Appeal have uniformly rejected the argument made by Mendez that *Coleman* should be extended to bar use of a defendant's statements from a parole eligibility hearing in an evidentiary hearing under section 1172.6. In *People v. Myles* (2021) 69 Cal.App.5th 688, 705 (*Myles*), Division One of the First Appellate District concluded *Coleman* did not require exclusion from the evidentiary hearing of the defendant's statements made during a parole eligibility hearing, explaining that "the Fifth Amendment privilege against self-incrimination protects persons from being compelled by "'governmental coercion'" to serve as witnesses against themselves in ""any *criminal case*,"'" citing *People v. Tom* (2014) 59 Cal.4th 1210, 1222-1223. By contrast, "a sentence modification under [former] section 1170.95 is an act of lenity and not a criminal trial." (*Myles*, at pp 705-706.) The court reasoned the Fifth Amendment's purpose to protect the defendant from government coercion was not implicated because the defendant "was not compelled to file a [resentencing] petition, nor to testify at her parole hearing . . . ." (*Myles*, at p. 706.) Rather, where the defendant had chosen to "testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by defendant bearing on some of the same issues." (*Ibid*.) Other appellate courts have reached the same conclusion. (See *People v. Duran* (2022) 84 Cal.App.5th 920, 930-932 [Second District, Division 2]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 586-590

19

(*Mitchell*) [Second District, Division 8]; *People v. Anderson* (2022) 78 Cal.App.5th 81, 93 (*Anderson*) [First District, Division 4]; but see *Mitchell*, at pp. 602-605 (dis. opn. of Stratton, P.J.).)

"The proper interpretation of a statute is a question of law we review de novo. [Citations.] ""'"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning."'"" [Citation.] "'[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole."'"" (*Lewis, supra*, 11 Cal.5th at p. 961; accord, *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.)

Mendez urges us to adopt the reasoning in Presiding Justice Stratton's dissent in *Mitchell* that the Legislature granted section 1172.6 petitioners "the right against self-incrimination, for it goes hand-in-hand with imposing the burden of proof on the prosecution." (*Mitchell, supra*, 81 Cal.App.5th at pp. 603-604 (dis. opn. of Stratton, P.J.).) We find the reasoning of *Myles* and the other courts that have found no Fifth Amendment right against self-incrimination in section 1172.6 proceedings persuasive because the defendant at the time of the evidentiary hearing stands convicted of murder (or other covered offense), in contrast to a defendant facing a criminal trial. The Legislature

expressly provided in section 1172.6, subdivision (d)(3), that the prosecution bears the burden to prove beyond a reasonable doubt the petitioner is guilty of murder under California law as amended by the changes to sections 188 or 189 made effective January 1, 2019. Further, subdivision (d)(3) specifies "[t]he admission of evidence in the hearing shall be governed by the Evidence Code." And the Legislature has provided in section 1172.6, subdivision (b)(3), that upon the filing of a facially sufficient petition, upon request, the court must appoint counsel for the petitioner. We therefore agree with Justice Stratton's observation in her dissent in *Mitchell* that the Legislature has extended substantial procedural protections to a section 1172.6 petitioner. (*Mitchell, supra*, 81 Cal.App.5th at pp. 603-604 (dis. opn. of Stratton, P.J.).) But it does not follow that the Legislature intended to afford petitioners who have been validly convicted of murder a Fifth Amendment right against self-incrimination in a section 1172.6 proceeding for relief from their convictions. We do not reach whether there should be a judicially created right against self-incrimination in an evidentiary hearing because absent the government coercion at issue under the Fifth Amendment, there is no justification for extending *Coleman* to a section 1172.6 evidentiary hearing.

We also do not agree with the *Mitchell* dissent that the Legislature's assignment of the burden of proof to the prosecution in an evidentiary hearing means a petitioner must have a right against self-incrimination. The *Mitchell* dissent relies for this proposition on the statement in *Coleman, supra*, 13 Cal.3d at page 876 that "'[t]he heavy burden . . . placed upon the prosecution in a criminal trial to prove through its own investigation the guilt of the defendant may be substantially

21

lightened if the prosecution is allowed to take advantage of the defendant's testimony at a prior probation revocation hearing.'" (See *Mitchell, supra*, 81 Cal.App.5th at p. 604 (dis. opn. of Stratton, P.J.).) But the *Coleman* court based its judicially-created rule on the potential for the People to take advantage of the probation revocation process to reduce their burden at trial, explaining "Whenever a probationer is charged with a criminal offense the People may, by the simple device of moving to revoke probation prior to trial, seek to force the probationer into a self-incriminatory statement at the revocation hearing." (*Coleman*, at p. 876.) Further, because the prosecution's object is "to secure the probationer's incarceration, whether by revocation of probation or by conviction and sentencing for the new offense," initiation of a pretrial probation revocation hearing would put the prosecution in a "'tails we win, heads you lose' position vis-a-vis the probationer." (*Ibid.*) By contrast, because Mendez was validly convicted of second degree murder at the time of his negotiated plea, with only his eligibility for relief from his conviction in light of the amendments to sections 188 and 189 at issue at the evidentiary hearing, the coercive gamesmanship that *Coleman* sought to remedy is not present.

Mendez acknowledges his argument depends on whether the Legislature granted convicted defendants who file facially sufficient petitions under section 1172.6 a right against self-incrimination at the evidentiary hearing to determine their eligibility for resentencing. But contrary to Mendez's contention that the section 1172.6 evidentiary hearing "is analogous . . . to a bench retrial," we agree with those Courts of Appeal that have observed "'a sentence modification under [section 1172.6] is an act of lenity and not a criminal trial.'" (*Anderson, supra,*

22

78 Cal.App.5th at p. 90.) A petitioner under section 1172.6 does not possess many of the constitutional rights afforded to a criminal defendant at trial. (See *Lewis, supra*, 11 Cal.5th at p. 973 [a petitioner under former section 1170.95 is not constitutionally entitled to counsel in the proceeding, but rather, possesses "a purely statutory right to counsel that attaches before the issuance of an order to show cause"]; *People v. James* (2021) 63 Cal.App.5th 604, 610 ["a convicted person litigating a [former] section 1170.95 petition does not enjoy the rights that the Sixth Amendment guarantees to criminal defendants who have not yet suffered a final conviction," including the right to a trial by jury]; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 ["The retroactive relief provided by section 1170.95 is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause."]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 ["the retroactive relief [defendants] are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis"].)

Because *Coleman*'s exclusionary rule is centered on the need to protect a defendant's constitutional privilege against self-incrimination, and Mendez did not possess that right at the section 1172.6 evidentiary hearing, his argument to extend *Coleman* to bar admission of his statements made at the parole eligibility hearing fails. (*Anderson, supra*, 78 Cal.App.5th at pp. 90, 93 ["Where the privilege against self-incrimination is not implicated, the rationale for immunities at issue in *Coleman* . . . disappears."].)

C.     *Substantial Evidence Supports the Trial Court's Finding Mendez Is Guilty of Second Degree Implied Malice Murder as a Direct Aider and Abettor*

Mendez argues substantial evidence does not support the trial court's finding Mendez is guilty of aiding and abetting implied malice murder because there is no evidence he aided or encouraged Valles in shooting Jimenez or knew Jimenez was armed.  Mendez asserts further there is no evidence he was beating Jimenez when Valles shot him, relying on Yoon's testimony the two men beating Jimenez behind the counter had stopped their attack before Valles shot Jimenez in the head and the prosecutor's argument at trial that it was Alberto and Caudillo who were beating Jimenez.  Substantial evidence supports the trial court's finding.

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188, subd. (a).)  "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not."  (*People v. Soto* (2018) 4 Cal.5th 968, 976; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  "Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses."  (*Gonzalez*, at p. 653; accord, *Vargas, supra*, 84 Cal.App.5th at p. 953.)  "A person who kills unlawfully with implied malice is guilty of second degree murder."  (*Gonzalez*, at p. 653.)  Section 188, subdivision (a)(3), "permits a second degree murder conviction only if the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought.  The

24

prosecution cannot 'impute[] [malice] to a person based solely on his or her participation in a crime.'" (*Gentile, supra*, 10 Cal.5th at p. 846, quoting § 188, subd. (a)(3); accord, *Vargas*, at p. 950.) Thus, "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile,* at p. 850; accord, *Vargas*, at p. 954 ["The aider and abettor 'need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life.'"].)

Although the jury convicted Valles of first degree murder in the killing of Jimenez, Mendez may still be validly convicted of second degree murder as an aider and abettor. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 ["'[O]nce it is proved that "the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea*.'"]; *People v. Nero* (2010) 181 Cal.App.4th 504, 514 [an aider and abettor may harbor a less culpable mental state than the direct perpetrator].)

Substantial evidence supports the trial court's finding Mendez acted with implied malice to directly aid and abet the murder.[9]  The evidence is sufficient to prove Mendez acted with

---

[9]     In their brief, the People focus on the felony-murder doctrine, arguing substantial evidence supports a finding Mendez was a major participant in the attack on Jimenez and acted with reckless indifference to human life.  However, at the evidentiary hearing the prosecutor did not argue Mendez was guilty of felony

conscious disregard for Jimenez's life in aiding Valles in the life-endangering conduct of shooting Jimenez, even if Mendez intended to seriously harm, but not kill Jimenez.  The video shows Mendez was the first of the large group of gang members to enter the liquor store and the first to throw merchandise at Jimenez.  Mendez, along with Magana, Caudillo, and Alberto, approached the counter behind which Jimenez was hiding and threw beer cans and other merchandise at him.  Before Mendez disappears from the camera frame, he can be seen passing directly in front of Valles while Valles was struggling with both hands to clear the gun (which had apparently misfired), raising a strong inference Mendez was aware Valles had a firearm.  Although it is true the video does not show Mendez beating Jimenez, Mendez admitted at his 2015 parole hearing that he kicked Jimenez and hit him with his fist.  As the trial court reasoned, Mendez's beating of Jimenez could have occurred during the portion of the video while Mendez is off-screen.  Indeed, the beating of Jimenez is not captured in the video.  Thus, the evidence supports the trial court's finding Mendez aided Valles's shooting of Jimenez by isolating and incapacitating Jimenez behind the counter while Valles prepared to shoot him.[10]

---

murder, and the trial court did not rely on the doctrine in its ruling.

[10]     Although the prosecutor at trial argued as to Valles that Alberto and Caudillo were beating up Jimenez, in the video, Alberto can be seen walking toward the door while Valles is attempting to manipulate the slide on the firearm.  Although Alberto then moves to the bottom of the frame, seven seconds later the gunshot is heard.  By contrast, Mendez and Caudillo cannot be seen once they disappear from view at the bottom of

Mendez relies on Yoon's trial testimony that suggested the two men were no longer beating Jimenez when Valles pulled the trigger. But Yoon testified Jimenez appeared to become unconscious before Valles fired. Thus, the evidence supports the trial court's finding Mendez successfully incapacitated Jimenez by punching and kicking him behind the counter to the point of unconsciousness, allowing Valles time to unjam the gun and shoot Jimenez.[11] That Mendez did not leave the store until after Valles shot Jimenez (and was the last one to leave the store before Valles) further supports the court's finding Mendez beat Jimenez to aid Valles in the shooting. The court's finding Mendez acted with conscious disregard for Jimenez's life is also supported by the letter Mendez wrote to Ralph, stating Mendez did not "sweat" his sentence because of the fact he is "alive and that Vato is dead." And Mendez admitted he was motivated by

---

the frame until Caudillo reemerges two seconds before the gunshot is heard (and Mendez reappears only after the gunshot).

[11]    We recognize the superior court relied on the testimony adduced at Valles's trial that Valles ordered the other gang members to "'hold the son of a bitch'" (referring to Jimenez) while Valles cleared the gun. Although this testimony was given after Mendez pleaded no contest to the charges, Mendez did not object to the trial court's consideration of the testimony at the evidentiary hearing, and he has not argued in his appellate briefing that the court improperly considered the evidence. He has therefore forfeited any challenge to consideration of the evidence. (*Lopez v. Ledesma* (2022) 12 Cal.5th 848, 866 ["'[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court.'"]; (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1318 [failure to raise argument in trial court results in forfeiture on appeal].)

his belief Jimenez had reported the location of homes of 12th Street gang members (Mendez's gang) to Jimenez's relatives, who were members of the rival PMR gang.

In short, even if Mendez did not enter the liquor store intending to kill Jimenez, the evidence supports the trial court's finding Mendez acted with conscious disregard for Jimenez's life in aiding Valles in shooting Jimenez (an act the natural and probable consequences of which are dangerous to human life) by attacking Jimenez behind the liquor store counter until he was rendered unconscious, knowing Valles was clearing his gun to shoot Jimenez. (See *Vargas, supra*, 84 Cal.App.5th at p. 954 [substantial evidence supported trial court's finding at section 1172.6 hearing that defendant was guilty of implied malice murder as an aider and abettor where defendant and shooter associated with the same criminal street gang; the murder occurred in gang territory; defendant initiated and escalated physical altercation with victim's brother by throwing beer at his head then punching and kicking him; and defendant encouraged confederate to "'[s]hoot the motherfucker'" before shooter fired]; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 392 [substantial evidence supported finding defendant was guilty of implied malice murder as an aider and abettor where defendant angrily stated he would "'take care of'" the victim; sought assistance from his brother-in-law who arrived with additional confederates; grabbed the victim by the neck and placed him in a chokehold; dragged him into a bedroom with his confederates; wrapped victim in a rug and stomped on him; placed a bag over victim's head after victim was stabbed; and poured gasoline all

28

over the home where murder occurred to start a fire to hide the evidence].)[12]

## DISPOSITION

The order denying Mendez's section 1172.6 petition for resentencing is affirmed. The trial court is directed to modify the abstract of judgment to correctly reflect that the one-year term on the firearm enhancement was stayed, and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.

---

[12] We do not reach Mendez's contention, raised for the first time in his reply, that the trial court erred by failing to consider his youth at the time of the offense. (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 591, fn. 3 ["We do not consider arguments raised for the first time in the reply brief without a showing of good cause . . . ."]; *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 63, fn. 27 [argument made for the first time in reply brief is forfeited].)