Filed 4/21/23

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| GUY TAKIGUCHI, | D079441 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2021-00010110-CU-PT-CTL) |
| VENETIAN CONDOMINIUMS MAINTENANCE CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

Weintraub Tobin Chediak Coleman Grodin and Brendan J. Begley for Defendant and Appellant.

Law Offices of Michael G. Kim and Michael Gene Kim for Plaintiff and Respondent.

A homeowners association is aptly described as " 'a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government.' "  (*Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 651.)  And "[w]ith power, of course, comes the potential for abuse."  (*Ibid*.)  One form of abuse may occur when incumbent board directors try to perpetuate their own power by failing to

hold regular homeowner meetings or elections. Corporations Code[1] section 7510, subdivision (c) provides homeowners with a judicial remedy to counteract such conduct in a nonprofit mutual benefit corporation. Specifically, the statute allows a court to summarily order the corporation to hold a regular meeting or election if it has failed to do so within specified time frames.

We here conclude that the trial court properly exercised this statutory authority by summarily ordering Venetian Condominiums Maintenance Corporation (Venetian) to hold a meeting for the purpose of counting the 166 written ballots cast for its January 20, 2021 annual member meeting and election. Substantial evidence supports the trial court's finding that there was a quorum present for that meeting. By adjourning the meeting based on the purported absence of a quorum, Venetian failed to conduct the scheduled meeting or cover the noticed agenda items, which included counting the ballots and determining the results. Accordingly, we affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Venetian's Bylaws and Election Rules*

Venetian is a condominium project with 368 condominium units in the University Town Center area of San Diego. It is a nonprofit mutual benefit corporation governed by the California Nonprofit Mutual Benefit Corporation Law. (§ 7110 et seq.)

Venetian is run by a board of directors with three directors. Its bylaws require the board to hold regular annual member meetings to elect directors. The members include all unit owners, with each unit having one vote.

---

[1]    All further statutory references are to the Corporations Code unless otherwise specified.

2

Section 3.04 of the bylaws (entitled "Quorum") imposes a 51 percent quorum requirement for annual member meetings, with the percentage based on the number of units *entitled* to vote. The bylaws also provide for a reduced one-third quorum requirement if the higher quorum is not met at the initial meeting. Specifically, Section 3.04 states in relevant part: "The presence at any meeting, either in person or proxy, of Members entitled to cast at least fifty-one (51%) percent of the total voting power of the Association shall constitute a quorum for any action except as otherwise provided in the Restrictions. If, however, such quorum shall not be present or represented at any meeting, a majority of the Members entitled to vote thereat shall have the power to adjourn the meeting to [a] date not less than five (5) days nor more than thirty (30) days from the meeting date, at which meeting the quorum requirements shall be one-third (1/3) of the total voting power."

Venetian's board has also adopted election rules, which require the appointment of an independent, third-party inspector of elections to preside over elections, receive ballots, count votes, and determine the results. Voting for directors must be by secret written ballot sealed in two envelopes. The inspector must provide notice of any election, including the date, time, and address where written ballots must be returned by mail or handed to the inspector of elections, and the date, time and location of the meeting at which ballots will be counted. The envelopes may be opened and the ballots counted and tabulated only at a properly noticed board or member meeting. Only the inspector of elections or a designee may open the envelopes and count and tabulate the ballots.

B.      *Prior History of Director Elections*

Ali Ghorbanzadeh owns 18 units at the Venetian. He was elected to Venetian's board of directors in 2008. In 2009, Ghorbanzadeh appointed his

3

son Sean Gorban[2] to the board. They have controlled the three-member board continuously from 2009 through at least 2021. Guy Takiguchi was elected as the third director in 2015.

From 2009 to 2021, the board repeatedly failed to hold annual elections, either due to the absence of a quorum or for other reasons. Ghorbanzadeh and his son also targeted opposition candidates Takiguchi and Elaine Nishime by fining them and trying to exclude their candidate statements from the ballot packets. Takiguchi successfully challenged these actions in court several times.

C.      *January 2021 Meeting and Election*

There were three directors on the board in 2020: Ghorbanzadeh, his son Sean Gorban, and Takiguchi. Ghorbanzadeh's seat was up for re-election at the 2020 annual meeting, and there were two other candidates for the seat, including Nishime. The annual meeting was supposed to be conducted in November or December 2020, but was delayed until January 2021.

Lisa Schwartz is the owner of The Ballot Box, Inc. (Ballot Box), which had a contract with Venetian to serve as its inspector of elections. On December 18, 2020, on behalf of the Venetian board, Ballot Box sent out a notice of annual homeowners meeting and director election, along with an agenda and written ballots for the election. The notice was for both an annual meeting to be held on January 20, 2021 and an "adjourned meeting" to be held on January 25, 2021. The notice explained the reason for the adjourned meeting as follows: "As the Association usually does not reach quorum at the first meeting, an adjournment date is also provided on this notice. The quorum for any such adjourned meeting is 25% [*sic* – should be

---

2      Sean Gorban and his brother Brian Gorban are also referred to in the record by the last name Gorban-Zadeh.

one-third] of the total voting power.  The inspector of election will not be present at the first meeting."

The notice of annual meeting stated that due to COVID-19 restrictions, "the meeting will only be available virtually although members will be permitted to deliver a ballot or obtain a replacement at the physical location. Members will not be permitted to remain at the physical location.  To join the meeting and observe the ballot counting, members must use the virtual platform."  The notice provided members with the necessary information to join the meeting online or by telephone and identified the physical location as the complex's clubhouse.  A cover letter sent by Ballot Box along with the notice advised:  "It is important that you participate in this meeting, by returning the enclosed ballot either by mail or in person at the meeting."

The notice advised that the election would be for one two-year term on the board.  With regard to the quorum requirement, it stated: "Representation may be by attendance in person at the meeting, by the return of a ballot, or by proxy."  The notice provided members with voting instructions and set a deadline of January 15, 2021 for Ballot Box's receipt of any mailed ballots.  It further stated:  "The envelopes are received and held by The Ballot Box until they are opened at the meeting. . . .  The SECRET BALLOT envelopes are then opened and the ballots tabulated.  The envelopes are only opened IF a quorum is met."

The written agenda for the membership meeting included seven agenda items as follows: (1) "Call to Order"; (2) "Introductions"; (3) "Balloting" (including "Verification of Quorum" and "Begin Tabulation of Ballots"); (4) "Board Reports"; (5) "Homeowner Open Forum"; (6) "Election Results"; and (7) "Adjournment."

Before the meeting, Ballot Box received the mailed ballots and maintained a ballot receipt list identifying the unit owners from whom it received them. Schwartz provided a copy of this list to multiple owners and board members both before and after the scheduled January 20, 2021 meeting. By the time of the meeting, Ballot Box had received 166 ballots.

Venetian's management specifically instructed Ballot Box not to attend the regular annual meeting scheduled for January 20, 2021, and only to attend the adjourned meeting scheduled for January 25, 2021. According to Schwartz, "[t]he adjourned meeting was specifically chosen and noticed for us to attend in lieu of the original meeting, to save the Association money from having us attend 2 meetings."

The regular meeting was convened virtually on January 20, 2021. There was no inspector of elections present at the clubhouse or remotely. Amber Korody, the community manager for Venetian, presided over the meeting remotely even though she was not the inspector of elections. She informed the participants that Ballot Box would not be attending "to save us money." Korody did not take roll, did not count the members present online or by telephone, and did not determine the number of units they represented or whether an owner of those units had already submitted a written ballot.

According to Korody, she called Schwartz during the meeting to determine the status of the ballots, and Schwartz informed her that based on the number of ballots received by the voting deadline, she had determined that a quorum was not met. But Schwartz denied making this determination. Schwartz explained: "I was not present at the Venetian's January 20, 2021 annual meeting and therefore could not and did not rule on anything that occurred at that meeting."

6

Korody declared that there was no quorum for the meeting because Ballot Box had only received 166 ballots, and the quorum was 188. However, Korody did not include in her count any members who were present online or by telephone representing units for which no written ballot had been submitted. After Korody declared that there was no quorum, there was a motion to adjourn the meeting and move the ballot count to the "adjourned meeting" previously scheduled for January 25, 2021. Sean Gorban seconded the motion, and the meeting was adjourned without a formal vote. No one prepared minutes for the meeting. Ghorbanzadeh later acknowledged that "people at the meeting were led to believe that there would be a [further] meeting on Monday [January 25]."

Nishime participated in the January 20, 2021 meeting remotely by computer and took multiple screenshots of the participants. With one exception, the screenshots showed only the participants' screen names, not their faces. However, Nishime was able to identify eight members who were present representing 37 units for which no written ballot had been submitted to Ballot Box. Ballot Box's ballot receipt list showed that no written ballot had been submitted for these 37 units. If those 37 units had been counted along with the 166 written ballots, there would have been a quorum of 203 present at the meeting—exceeding the 188 minimum.

The eight participating members who represented units for which no ballot had been submitted included Ghorbanzadeh (representing 18 units), his son Sean Gorban (representing one unit), his other son Brian Gorban (representing three units), and an ally of Ghorbanzadeh's who was also running for the director's seat, Ben Ariannejad (representing one unit). Takiguchi asserted that Ghorbanzadeh and his allies did not submit their ballots "in a deliberate and tactical effort to not reach quorum so they could

7

remain in power another year or two." Venetian submitted no evidence refuting this accusation, or disputing that Ghorbanzadeh and his allies participated in the meeting, or explaining why they did not submit a written ballot.

On January 22, 2021, two days after the aborted member meeting, Venetian's three-member board of directors convened an emergency board meeting. Ghorbanzadeh announced that the annual membership meeting had "failed." He and his son Sean Gorban voted to cancel the "adjourned meeting" previously scheduled for January 25, 2021 due to the lack of a quorum on January 20, 2021. Takiguchi voted against the motion. Later the same day, at the board's direction, Korody sent a notice to the members notifying them of the board's action. The notice stated in relevant part: "On Wednesday January 20, 2021, there was an attempt to hold the Annual Meeting of the members for the purposes of holding the Annual Director Election. Due to a lack of a quorum, the meeting was not held. . . . [¶] As there was no motion, as required by the governing documents in the Annual Meeting to reconvene, there could be no reduced quorum for any subsequent meetings. Therefore, the Board has cancelled the Special Membership Meeting that was previously scheduled for January 25, 2021."

Because the January 25 meeting was cancelled, nobody ever counted the 166 written ballots that were mailed to Ballot Box. Many Venetian members were upset by this decision. Fifty-six members representing 15 percent of the voting power signed a petition calling on the board to conduct a meeting to count the ballots. Schwartz also sent an email to Korody and Venetian's counsel stating her "professional opinion" that "it was bad form/bad faith for the Board" to cancel the January 25 meeting without counting the ballots. She advised that Ballot Box "would be happy to attend

8

a rescheduled meeting to open and count the ballots so the election may be completed for the owners of this community."  On behalf of the board, however, Korody responded to the members' petition as follows:  "Please be advised that the submitted petition is not appropriate in that the members cannot hold a meeting to count ballots that were failed as a result of a failed election."

D.    *Trial Court Proceedings*

On March 8, 2021, Takiguchi filed a petition against Venetian seeking a court order under section 7510.  The petition argued that there was a quorum present at the January 20, 2021 annual meeting—counting both the 166 written ballots received by Ballot Box and the 37 additional units represented by members participating online or by telephone for which no ballot had been submitted.  The petition sought a summary order directing Venetian to "notice and hold the annual meeting for the sole purpose of counting the ballots in custody of [Ballot Box] as of January 20, 2021 and tabulating and certifying the results of that vote as the election results for the Venetian in 2021."

In support of the petition, Takiguchi submitted declarations from himself, Nishime, and Schwartz, copies of Nishime's screenshots, the 56 member petitions, Ballot Box's ballot receipt list, Venetian's bylaws, election rules, and homeowner directory, the December 18, 2020 notice of annual meeting and election, and emails written by various participants.

9

Venetian filed a five-page opposition to the petition, but submitted no defense evidence and made no objections to Takiguchi's evidence.[3] Venetian's initial opposition acknowledged that under its bylaws and applicable statutes, the annual meeting required "a quorum of the members present *in person*, by proxy, *or* by submitting a secret written *ballot by mail*." (Italics added.) Venetian nevertheless argued that there was no quorum for the January 20, 2021 meeting because only "160 ballots were received by the voting deadline on January 15, 2021, and 185 [*sic – should be 188*] ballots were needed to reach a quorum." Venetian's opposition did not mention or dispute Takiguchi's evidence that there were 37 additional units represented by members who were participating in the virtual meeting for which no ballot had been submitted.

At an initial hearing in April 2021, the trial court requested supplemental briefing on several issues. Represented by new counsel, Venetian changed its position and filed a supplemental brief arguing that only the 166 ballots received before the January 20, 2021 meeting counted towards the quorum; that Venetian did not fail to hold an annual meeting because the 166 ballots did not satisfy the quorum requirement; and that the requirements for reconvening the annual meeting with a lower quorum were not met. Venetian's supplemental opposition again did not dispute Takiguchi's evidence that there were 37 units represented at the January 20, 2021 meeting for which no written ballot had been submitted.

---

[3]     Venetian later filed evidentiary objections to some supplemental evidence submitted by Takiguchi, but the trial court overruled all evidentiary objections and Venetian has not renewed those particular objections on appeal. Venetian submitted no evidentiary objections to any of the evidence submitted with Takiguchi's original moving papers.

10

At another hearing in June 2021, the court instructed Venetian to provide the available meeting minutes. Venetian later submitted Korody's declaration with attached exhibits, which did not include any minutes of the January 20, 2021 meeting. Korody's declaration purported to describe aspects of the meeting, but again did not dispute Takiguchi's evidence regarding the 37 non-voting units represented at the meeting.

After taking the matter under submission, the trial court granted Takiguchi's petition. The court reasoned:

> "A virtual Annual Meeting was scheduled for January 20, 2021. The Venetian's quorum requirements are 51% and 33%. (Venetian Bylaws 3.04 . . . .) There are 368 members of the Association and thus, a quorum is 185 [*sic* – should be 188] members. The quorum requirement may be met by the members present in person, by proxy or by submitting a secret written ballot. (Corp. Code, § 7512; Bylaws § 3.04 and CC § 5115(d); see also Respondent's Opposition, p. 3:12-14.) Here, 160 ballots were received by the voting deadline . . . with another five or six ballots received thereafter constituting a total of 166 ballots. Petitioner has submitted evidence that 37 units were present at the virtual meeting. (Nishime Dec. ¶23.) Respondent provides no contrary evidence. Further, Respondent confirms that no contemporaneous record was made of the meeting by any of Respondent's agents. Thus, based upon the evidence submitted, the quorum requirements were met."

Accordingly, the trial court ordered Venetian "to hold the annual meeting for the purpose of counting the ballots in custody of the Ballot Box as of January 20, 2021."

## DISCUSSION

### I

We first consider whether Venetian's appeal is moot. The January 20, 2021 annual member meeting was for the purpose of electing a director for a

11

two-year term to the seat held by Ghorbanzadeh.  Because more than two years have now passed, we asked the parties to brief the mootness issue.  In response, the parties notified us that there was another annual membership meeting scheduled in November 2022 for the purpose of conducting an election for the same director's seat, but the election was unsuccessful because there was no quorum for the meeting.  There has been no successful election for this seat since the disputed meeting of January 20, 2021.  Because section 4.02 of the Venetian bylaws provides that "all incumbent Directors shall hold their office until their successors are elected," Ghorbandzadeh continues to hold the seat that was the subject of the January 20, 2021 election, even though he has not been reelected.

Both parties take the position that we should not dismiss the appeal as moot.  We agree that the appeal is not moot.  Even though the original two-year term would have expired by now, the winner of the January 20, 2021 election would still remain in the seat under Venetian's bylaws because a successor has not yet been elected.  Thus, if the ballots from the January 20, 2021 meeting are counted as directed by the trial court, and Ghorbandzadeh is determined not to have been the winner, the winner will be entitled to take his place on the board until a successor is elected.  In these circumstances, Venetian's appeal is not moot because we would still be able to grant it effective relief if we were to reverse the trial court's order directing that the ballots be counted.  (See *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 175 [appeal is moot if superseding events make it impossible to grant appellant any effective relief].)

## II

We next consider whether there is sufficient evidence to support the trial court's finding that there was a quorum for the January 20, 2021

12

meeting. On appeal, Venetian has once again abandoned its argument that only the written ballots received by Ballot Box count towards the quorum. More specifically, Venetian does not contest the trial court's conclusion that non-voting units represented by members who personally attended the meeting online or by telephone count towards the quorum, as well as units for which a written ballot had been submitted.[4] For the first time in its opening brief, however, Venetian now asserts that the evidence does not support the trial court's finding that there were 37 units represented at the virtual meeting for which no written ballot had been submitted. Although Venetian did not make this argument in either of its written oppositions to Takiguchi's petition, we will decide this issue on the merits because a sufficiency of evidence claim may be raised for the first time on appeal.[5] (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17.) We review the trial court's factual finding of a quorum for substantial evidence, viewing the entire record in the light most favorable to the finding. (See *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

Substantial evidence supports the trial court's finding that there was a quorum present for the January 20, 2021 meeting. Nishime participated in

[4] Because the issue has not been raised on appeal, we express no view as to whether this is a correct interpretation of Venetian's bylaws and applicable provisions of the Corporations Code. We note, however, that Venetian's notice of annual meeting similarly stated that for the purpose of the quorum requirement, "[r]epresentation may be by attendance in person at the meeting, by the return of a ballot, or by proxy."

[5] Although the sufficiency of evidence issue is preserved for appeal, the evidentiary objections to Takiguchi's evidence asserted for the first time in Venetian's opening brief are not. These include Venetian's multiple objections based on lack of personal knowledge and hearsay. Venetian forfeited these objections by failing to assert them in the trial court. (Evid. Code, § 353, subd. (a); *Gormley v. Gonzalez* (2022) 84 Cal.App.5th 72, 82.)

the meeting online and took multiple screenshots of the participants. She had lived at Venetian for several years, she knew who the owners were and how many units they owned, and she had the Venetian homeowner directory with her during the meeting. Based on her observations and screenshots, she was able to identify the participants by their screen names and compile a list of them. Moreover, the inspector of elections (Ballot Box) had disseminated its ballot receipt list, which identified the units for which a written ballot had already been submitted. Thus, Nishime was able to identify eight members who were present online or by telephone representing 37 units for which no written ballot had been submitted to Ballot Box. Counting those 37 units along with the 166 units for which written ballots had been submitted, there is substantial evidence to support the trial court's finding of a quorum in excess of the 188 minimum.

Venetian argues that Nishime had no personal knowledge of the screen names used by those who participated in the meeting remotely. For example, Venetian claims that the screen name "Dr. ali" used by one of the participants could refer to another owner with the first name Ali, rather than Ali Ghorbanzadeh. Absent any contrary evidence, however, there was ample evidence for the trial court to infer that this was Ghorbanzadeh's screen name. Ghorbanzadeh was both an incumbent director and a candidate for re-election with an obvious interest in the meeting. Ghorbanzadeh later wrote an email purporting to describe what happened in the meeting. Moreover, according to one of Nishime's screen shots, the person with the "Dr. ali" screen name also spoke at the meeting and the trial court could reasonably infer that Nishime would have recognized his voice from her attendance at past board meetings. Finally, it would have been a simple matter for Venetian to submit a declaration refuting the evidence that Ghorbanzadeh

14

participated in the meeting using the screen name "Dr. ali."  But Ghorbanzadeh submitted no declaration, and Korody's declaration submitted on Venetian's behalf is conspicuously silent on the issue, even though she presided over the meeting.  The trial court could reasonably infer from Venetian's failure to present any contrary evidence that Ghorbanzadeh did in fact participate in the meeting using this screen name.  (Evid. Code, §§ 412, 413; *Westinghouse Credit Corp. v. Wolfer* (1970) 10 Cal.App.3d 63, 69 [adverse inference against party whose declaration did not address material issues].)

As for the other meeting participants Nishime identified as representing non-voting units, at least four of them used real first and last names of known unit owners as their screen names in the meeting.  These included Sean Gorban (one unit), Mike Fani (one unit), Margarita Abagyan (eight units), and Bahram ("Ben") Ariannejad (one unit)—whose face was also shown in the screenshots.  Absent any evidence that these people were imposters, the trial court could reasonably conclude that they were who they purported to be.  Together with Ghorbanzadeh and his 18 units, these individuals accounted for a total of 29 non-voting units, which was more than enough for a quorum when added to the 166 ballots received.

Finally, we reject Venetian's argument that there were no "adequate safeguards" in place to verify that each person participating remotely was a member.  It was Venetian's responsibility to have proper procedures in place to determine who was participating in the meeting and whether there was a quorum.  Venetian deliberately chose not to have the inspector of elections attend the January 20, 2021 meeting.  Venetian also chose not to take roll, keep minutes or other records, or determine how many units represented at the meeting had not submitted a written ballot.  In these circumstances,

15

Venetian cannot fault Takiguchi for presenting the best evidence available to prove the existence of a quorum. Taken together, Takiguchi's evidence and the reasonable inferences from Venetian's failure to refute it constitute substantial evidence to support the trial court's finding of a quorum.

III

Venetian contends that the trial court exceeded its statutory authority by directing that ballots cast for the January 20, 2021 annual meeting be counted. According to Venetian, even assuming that there was a quorum for the meeting, section 7510, subdivision (c) is only "future-looking" and does not give a court authority "to count ballots from a prior meeting." Venetian argues that an order directing that completed ballots be counted may be issued only "via a regular civil action that affords discovery and other due process, not in the summary proceedings that section 7510 and 7511 contemplate."[6] This is an issue of statutory interpretation, which we review de novo. (*Lopez v. Ledesma* (2022) 12 Cal.5th 848, 857.)

Section 7510 governs meetings of nonprofit mutual benefit corporations, including their place and time, frequency, and remote participation. Subdivision (b) provides: "A regular meeting of members shall be held on a date and time, and with the frequency stated in or fixed in accordance with the bylaws, but in any event in each year in which directors are to be elected at that meeting for the purpose of conducting such election, and to transact any other proper business which may be brought before the meeting."

---

[6] Although Venetian did not make this argument in the trial court, we exercise our discretion to consider it on appeal because it presents a pure question of law based on undisputed facts. (*Howitson v. Evans Hotel, LLC* (2022) 81 Cal.App.5th 475, 489.)

16

Section 7510, subdivision (c) provides for a summary judicial remedy if the corporation fails to hold a regular meeting or written ballot within specified time frames.  It states:  "If a corporation with members is required by subdivision (b) to hold a regular meeting and fails to hold the regular meeting for a period of 60 days after the date designated therefor or, if no date has been designated, for a period of 15 months after the formation of the corporation or after its last regular meeting, or if the corporation fails to hold a written ballot for a period of 60 days after the date designated therefor, then the superior court of the proper county may summarily order the meeting to be held or the ballot to be conducted upon the application of a member or the Attorney General, after notice to the corporation giving it an opportunity to be heard."  (§ 7510, subd. (c).)

By its terms, this summary remedy is available in two different circumstances: (1) if the corporation is required by subdivision (b) to hold a regular meeting and "fails to hold the regular meeting" within the specified time frames, or (2) "if the corporation fails to hold a written ballot" within 60 days of the designated date.  (§ 7510, subd. (c).)  If either of these conditions is present, the court "may summarily order the meeting to be held or the ballot to be conducted . . . ."  (*Ibid.*)

We begin by considering whether the statutory phrase "fails to hold a written ballot" includes failing to count ballots cast by members in an election, and whether the court's statutory authority to order "the ballot to be conducted" includes ordering that completed ballots be counted.  (Corp. Code, § 7510, subd. (c).)  On this issue, the literal meaning of the statutory language is arguably susceptible to differing interpretations.  On the one hand, to "hold" or "conduct" a ballot could conceivably be construed narrowly to mean only allowing members to cast votes in an election—but not counting

17

the completed ballots.  On the other hand, the statutory language could reasonably be interpreted more broadly to include counting the ballots as an inherent part of conducting any election.  (See, e.g., Elec. Code, § 15702 [defining word "vote" as used in the California Constitution to include "all action necessary to make a vote effective," including "having the ballot counted properly and included in the appropriate total of votes cast"].)

When the language of a statute is ambiguous and reasonably susceptible to more than one meaning, we look to a variety of extrinsic aids to resolve the ambiguity, including the ostensible objects to be achieved, the evils to be remedied, legislative history, public policy, and the statutory scheme of which the statute is a part.  (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 992.)  Our ultimate objective is to construe the statute in a way that most closely comports with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences.  (*People v. Rubalcava* (2000) 23 Cal.4th 322, 328.)

Although the legislative history is silent on the issue,[7] one evident purpose of section 7510, subdivision (c) is to provide a quick judicial fix when an existing board is unfairly retaining its own power by prolonging its existence without holding regular member meetings or elections.  The statute seeks to prevent this by providing a summary remedy for members to compel the corporation to hold regular meetings and elections when it fails to do so.

---

[7]    The Legislature enacted section 7510 in 1978 as part of Assembly Bill No. 2180, a lengthy bill that added the Nonprofit Corporation Law (§ 5000 et seq.), the Nonprofit Mutual Benefit Corporation Law (§ 7110 et seq.), and the Nonprofit Religious Corporation Law (§ 9110 et seq.).  (Stats. 1978, ch. 567, § 6 (1977-1978 Reg. Sess.).)  We have examined the available legislative history and found nothing that sheds light on the question before us.

18

This purpose is best served by interpreting the statute to permit a court to order completed ballots to be counted. Counting the ballots is a necessary part of conducting any bona fide election. An essential purpose of the required member meetings and ballots is to elect directors—and directors cannot be elected unless the ballots are counted. (See § 7510, subd. (b) [referring to regular member meetings "in which directors are to be elected"]; § 7513, subd. (e) ["Directors may be elected by written ballot under this section . . . ."].) Thus, an essential purpose of the law—to provide a quick and efficient mechanism for members to prevent directors from perpetuating their own power—favors construing the trial court's statutory authority to order a "ballot to be conducted" to include counting the completed ballots. (§ 7510, subd. (c).)

Venetian's contrary interpretation would provide a virtual roadmap for easy evasion of the statute. For example, a board of directors could retain its own power and circumvent the statutory remedy simply by holding an election and allowing members to vote, but then locking the ballots away in a file cabinet without counting them. "We will not adopt '[a] narrow or restricted meaning' of statutory language 'if it would result in an evasion of the evident purpose of [a statute], when a permissible, but broader, meaning would prevent the evasion and carry out that purpose.'" (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291–1292 (*Copley Press*).)

A remedial statute should be liberally construed to effectuate its object and purpose, and to suppress the mischief at which it is directed. (*Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1598.) A remedial statute is one which provides a means for the enforcement of a right or the redress of a wrong. (*Id*. at p. 1597.) Section 7510, subdivision (c) is a remedial statute because it provides a judicial remedy for members of a mutual benefit corporation to

19

redress the corporation's failure or refusal to conduct required meetings or elections. As a remedial statute, it must be liberally construed to effectuate its basic purpose and prevent evasion.

We therefore conclude that the trial court's statutory authority to order "the ballot to be conducted" includes counting the completed ballots. (§ 7510, subd. (c).) "[F]rom the perspective of both statutory language and practical consequences, [Venetian]'s narrow interpretation is not the more reasonable one, and would not produce reasonable results that most closely comport with the Legislature's apparent intent." (*Copley Press*, *supra*, 39 Cal.4th at p. 1296.)

For similar reasons, we also conclude that the trial court's order is authorized by the language of the statute permitting it to "summarily order the meeting to be held" if the corporation "fails to hold the regular meeting" within 60 days after the date designated. (§ 7510, subd. (c).) Venetian noticed an annual member meeting for January 20 and January 25, 2021. The notice of meeting was accompanied by a meeting agenda, and the agenda items included tabulating the ballots and determining election results. But the January 20, 2021 meeting was adjourned without covering any of these substantive agenda items, and the January 25, 2021 meeting was cancelled and never rescheduled. As a result, Ghorbanzadeh remained in office even though Venetian did not actually conduct a meeting to count the completed ballots for his expired term.

Construing the statutory language liberally to achieve its objectives, we conclude that Venetian "fail[ed] to hold the regular meeting" that was scheduled for the purpose of counting the ballots and determining the election results. (§ 7510, subd. (c).) Adjourning a meeting immediately after calling it to order—without covering any of the substantive agenda items—is

20

the functional equivalent of not holding the meeting at all. For this reason, the trial court had authority to "summarily order the meeting to be held" for the purpose of completing the previously noticed agenda items, including counting the ballots and determining the results.[8] (§ 7510, subd. (c).)

IV

Finally, Venetian argues that the trial court's order "disenfranchises" members who might have cast a ballot at the January 20, 2021 meeting if it had not been adjourned prematurely. This argument is forfeited because Venetian did not make it in either of its briefs opposing Takiguchi's petition below. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.) Even if it were not forfeited, however, there is no evidence to support it. Under Venetian's instructions for the election, written ballots could be returned only by mail to Ballot Box or in person at the clubhouse at the time of the meeting. Venetian submitted no evidence that any member was present at the clubhouse to deliver a written ballot and prevented from

---

[8] In fact, the legislative scheme suggests to us that the Legislature intended the statute to apply when a regular meeting is not conducted because of the absence of a quorum. The statute specifically provides that when the corporation fails to hold a regular meeting and the court summarily orders the meeting to be held under section 7510, subdivision (c), the corporation's usual quorum requirements will not apply. Section 7510, subdivision (d), provides in relevant part: "The votes represented, either in person (or, if proxies are allowed, by proxy), at a meeting called or by written ballot ordered pursuant to subdivision (c), and entitled to be cast on the business to be transacted shall constitute a quorum, *notwithstanding any provision of the articles or bylaws or in this part to the contrary*." (Italics added.) We see no reason why the Legislature would have decided to override the corporation's usual quorum requirement unless it contemplated that regular meetings and elections might not be conducted because of the absence of such a quorum. We need not decide this issue, however, because we conclude that there was substantial evidence to support the trial court's finding of a quorum.

doing so at the time of the meeting.  On the contrary, Ghorbanzadeh himself stated that Takiguchi "was the only one at the Clubhouse" and "[t]he rest of the interested members had joined in."  Takiguchi had already submitted a written ballot by mail.  Thus, the record does not support Venetian's argument that anyone would be disenfranchised by the trial court's order directing that the submitted ballots be counted.

## DISPOSITION

The trial court's order is affirmed.  Takiguchi shall recover his costs on appeal.

BUCHANAN, J.

I CONCUR:

DATO, J.

22

J. O'Rourke, dissenting.

I respectfully dissent. The trial court in this case issued an order under Corporations Code section 7510 (section 7510) that defendant and appellant Venetian Condominiums Maintenance Corporation (Venetian) hold an annual meeting for the purpose of counting ballots collected by an election inspector for its January 2021 annual membership meeting. In its ruling, the court found a quorum was reached by the members present at a previously noticed annual meeting that was adjourned for a claimed lack of quorum. If the court ordered Venetian to hold a new annual meeting because it never conducted its annual meeting in 2021, the order is erroneous because under section 7510, Venetian's quorum requirement is irrelevant. At a meeting ordered under that statute, any voting members who appear constitute a quorum and *those members* are entitled to elect directors at *that* meeting. If the court's order is that Venetian must reconvene the annual meeting that took place in January 2021 so as to count the ballots collected at that time, the court acted without authority under section 7510 because the summary remedy under that statute comes into play only when a meeting has not taken place at all. When a meeting has occurred and a faulty election has been conducted, the preconditions to section 7510 are absent. In any case, the court erred. The majority—stretching the statute beyond its bounds to give homeowners a truncated remedy for perceived abuses of power by homeowners associations—have compounded the court's error. Plaintiff and respondent Guy Takiguchi's remedy was not via summary relief under section 7510, but to seek a mandatory injunction under Code of Civil Procedure section 526 in a lawsuit contesting the election's validity, affording the parties the protections and process associated with such a proceeding.

The majority recognizes that section 7510, subdivision (c) sets forth a summary judicial remedy. Section 7510, subdivision (c) provides: "If a corporation with members is required by subdivision (b) to hold a regular meeting and fails to hold the regular meeting for a period of 60 days after the date designated therefor or, if no date has been designated, for a period of 15 months after the formation of the corporation or after its last regular meeting, or if the corporation fails to hold a written ballot for a period of 60 days after the date designated therefor, then the superior court of the proper county may summarily order the meeting to be held or the ballot to be conducted upon the application of a member or the Attorney General, after notice to the corporation giving it an opportunity to be heard." (§ 7510, subd. (c).)

The statute allows a court to grant relief in two circumstances: when a corporation required by subdivision (b) to hold a regular meeting "fails to hold the regular meeting" within specified time frames, "or if the corporation fails to hold a written ballot" within a specified period of time. (§ 7510, subd. (c); see *People v. Perez* (2021) 67 Cal.App.5th 1008, 1015 [use of word "if" signifies a statutory condition]; *Mel v. Franchise Tax Board* (1981) 119 Cal.App.3d 898, 908, fn. 10; *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [courts must give ordinary and usual meaning to words used in

statutes].)[1]  Because section 7510 sets out a summary proceeding for limited injunctive relief, its provisions must be strictly construed.  (Accord, *Dr. Leevil, LLC v. Westlake HealthCare Center* (2018) 6 Cal.5th 474, 480 [holding with respect to unlawful detainer statutes]; see also *Bawa v. Terhune* (2019) 33 Cal.App.5th Supp. 1, 5 [same].)  " 'The statutory requirements in such proceedings " 'must be followed strictly' " ' " and " 'relief not statutorily authorized may not be given . . . .' " (*Dr. Leevil*, at p. 480; *Bawa*, at p. 5.)  Thus, it is only when either condition is met does the court have authority to "summarily order the meeting to be held or the ballot to be conducted" upon a proper application and notice to the corporation.  When, as in this case, the meaning is clear, " 'there is no need for construction and courts should not indulge in it.' " (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 413.)

No reading of the court's order saves it under a proper interpretation of section 7510.  As stated, the court ordered Venetian "to hold the annual meeting for the purpose of counting the ballots in custody of [Venetian's election inspector] as of January 20, 2021."  If the court ordered Venetian to

_____

[1]      Venetian's meeting was conducted in part via electronic video screen communication.  Subdivision (f) of section 7510 permits meetings to be held in such a manner under specified conditions, including that the "corporation implements reasonable measures . . . to provide members and proxyholders, if proxies are allowed, a reasonable opportunity to participate in the meeting and to vote on matters submitted to the members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with those proceedings . . . ."  Effective January 1, 2022, the Legislature amended subdivision (f) of the statute to, among other things, add another prerequisite for conducting a membership meeting by electronic transmission, namely that the corporation implement reasonable measures "to verify that each person participating remotely is a member or proxyholder, if proxies are allowed." (§ 7510, subd. (f), as amended by Stats. 2022, ch. 617, § 61.)  Any order that Venetian hold a regular membership meeting would require it to engage in such reasonable verification methods.

3

conduct a new annual meeting, the order cannot stand properly viewing subdivision (c) of section 7510 in context with subdivision (d) of the statute. (See *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 300 [statutory language must be examined in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment].)

Subdivision (d) comes into play when the court orders a meeting or a written ballot take place "pursuant to subdivision (c) . . . ." Subdivision (d) provides: "The votes represented, either in person (or, if proxies are allowed, by proxy), at a meeting called or by written ballot ordered pursuant to subdivision (c), and entitled to be cast on the business to be transacted *shall constitute a quorum, notwithstanding any provision of the articles or bylaws or in this part to the contrary*. The court may issue such orders as may be appropriate including, without limitation, orders designating the time and place of the meeting, the record date for determination of members entitled to vote, and the form of notice of the meeting." (§ 7510, subd. (d), italics added.)

When ordering a new annual meeting to be held under subdivision (c), the quorum is specified in subdivision (d). It is not for the trial court to determine whether a quorum is met under association rules, as the court did here. The statute specifies that for any court-ordered meeting or ballot, a quorum *is reached* by the votes represented and entitled to be cast *notwithstanding* the corporation's bylaws, articles, or other parts of the Corporations Code pertaining to nonprofit mutual benefit corporations. To interpret section 7510 as permitting a trial court in a section 7510, subdivision (c) summary proceeding to judicially determine whether a quorum was reached under an association's bylaws or rules renders subdivision (d) " 'meaningless or inoperative' " (*Hassan v. Mercy American*

4

*River Hospital*, *supra*, 31 Cal.4th at pp. 715–716; see also *Citizens for a Responsible Caltrans Decision v. Department of Transportation* (2020) 46 Cal.App.5th 1103, 1119) contrary to settled principles of statutory construction.

The "without limitation" language in the remainder of section 7510, subdivision (d) does not authorize the relief given by the lower court, as Takiguchi maintains. In *Johnson v. Tago, Inc.* (1986) 188 Cal.App.3d 507, the Court of Appeal addressed nearly identical language in section 600 of the General Corporation Law relating to shareholder meetings.[2] The court agreed that the sentence at issue "is 'concerned with the mechanical aspects of holding the annual shareholders meeting.' " (*Johnson v. Tago, Inc.*, at p. 515.) "The judicial power to 'issue such orders as may be appropriate' is reasonably construed as referring to caretaking details and procedure involved in such a meeting. It cannot be construed as a license for courts to trespass upon substantive matters confided to the directors and shareholders of a corporation." (*Ibid.*)

If the court's order was that Venetian must count ballots collected at the duly noticed and conducted January 2021 annual meeting (a quorum having been met), it is still not authorized by section 7510. When a meeting has taken place or a written ballot held, the preconditions to section 7510 summary relief have not occurred.

---

[2] Section 600 of the General Corporation Law vests courts with the authority to summarily order members to hold a meeting. It "grants the trial court power to order an annual meeting *if one has not been scheduled* in the ordinary course of events." (*Johnson v. Tago, Inc.*, *supra*, 188 Cal.App.3d at p. 515, italics added; see also Legis. Com. com., Deering's Ann. Corp. Code, § 600 (2009 ed.) p. 13 ["subdivision (c) [of section 600] authorizes the superior court upon application of a shareholder to summarily order the meeting to be held" so as "[t]o provide prompt relief in the event an annual meeting is not held"].)

The majority characterizes section 7510 as remedial (Maj. opn., *ante*, at p. 20) so as to engage in broad judicial construction and conclude the statutory authority of a court to order "the ballot to be conducted" includes counting previously collected ballots. (Maj. opn., *ante*, at p. 20.) Section 7510 is no more remedial than any injunction. The relevant question is whether the statute gives the court authority to proceed as it did, and even with a remedial statute, "liberal construction can only go so far." (*Soria v. Soria* (2010) 185 Cal.App.4th 780, 789, distinguishing *Leader v. Cords* (2010) 182 Cal.App.4th 1588.) "The rule that a remedial statute is construed broadly does not permit a court to ignore the statute's plain language . . . ." (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 842; see *Quarry v. Doe I* (2012) 53 Cal.4th 945, 988 [citing cases for proposition that "rule of liberal construction of remedial statutes 'does not mean that a court may read into the statute that which the Legislature has excluded, or read out that which it has included' "]; *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 645 ["A mandate to construe a statute liberally in light of its underlying remedial purpose does not mean that courts can impose on the statute a construction not reasonably supported by the statutory language"].) Courts do not have the authority to rewrite legislation "to ' "conform to [a party's] view of what [the law] should be." ' [Citations.] . . . " '[U]nder the guise of construction, a court should not rewrite the law, add to it what has been omitted, omit from it what has been inserted, give it an effect beyond that gathered from the plain and direct import of the terms used, or read into it an exception, qualification, or modification that will nullify a clear provision or materially affect its operation so as to make it conform to a presumed intention not expressed or

6

otherwise apparent in the law.' " ' " (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 393.)

Under its plain terms, section 7510, subdivision (c) authorizes the court only to summarily order a "ballot to be conducted" when one has not taken place previously. That the Legislature did not intend in section 7510 to permit a court to summarily order the counting of collected ballots for a previously held meeting is evidenced by other provisions of the chapter in which it refers to ballots being "counted." Section 7513, which addresses actions of a nonprofit mutual benefit corporation without a meeting, states in part: "Ballots shall be solicited in a manner consistent with the requirements of subdivision (b) of Section 7511 and Section 7514. All such solicitations shall indicate the number of responses needed to meet the quorum requirement and, with respect to ballots other than for the election of directors, shall state the percentage of approvals necessary to pass the measure submitted. The solicitation must specify the time by which the ballot must be received *in order to be counted.*" (§ 7513, subd. (c), italics added.) The Legislature knows how to reference "count[ing]" ballots, but deliberately did not use that term in section 7510, which only permits the court to summarily order a ballot be "conducted" when one has not taken place at all. (See Merriam-Webster Unabridged Dict. Online (2023), <http://unabridged.merriam-webster.com/unabridged/conduct, par. 2a> [as of April 11, 2023] [defining "conduct" as the "act, manner, or process of carrying out (as a task) . . . ."].) " 'When the Legislature "has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded." ' " (*People v. Buycks* (2018) 5 Cal.5th 857, 880; see also *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 507.)

In short, the trial court's power under section 7510 does not encompass declaring quorums or ordering ballots collected in previously held meetings to be counted.  The statute does not permit the remedy imposed by the court.  Because the trial court lacked authority to grant relief under section 7510, I would reverse the order.


O'ROURKE, Acting P.J.